**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**(Eastern Division)**

| | |
|---|---|
| IN RE:<br><br>    Robert N. Lupo,<br><br>              Debtor | Chapter 11<br><br>Case No. 09-21945-WCH |

**MOTION OF ROCKLAND TRUST COMPANY FOR RELIEF FROM STAY**
**AND IMMEDIATE APPOINTMENT OF TRUSTEE, OR, IN THE ALTERNATIVE,**
**FOR TERMINATION OF EXCLUSIVITY**

**(Emergency Relief Requested With Respect to Property at 45 South Street,**
**Waltham, Massachusetts)**

Pursuant to Sections 362(d)(1) and 362(d)(2) of the Bankruptcy Code, Rockland Trust

Company ("Rockland"), by its attorneys, hereby requests that the Court grant it relief from the

automatic stay to permit Rockland to take possession of and to foreclose its mortgages on the

following real properties owned by the within debtor, Robert N. Lupo ("Debtor" or "Lupo"):

- 45 South Street, Waltham, MA 02453
- 719-723 Main Street, Waltham, MA 02451
- 22 Felton Street, Waltham, MA 02451
- 91 Felton Street, Waltham, MA 02451
- 32 Dartmouth Street, Waltham, MA 02453

(collectively, the "Properties").  Rockland is entitled to such relief because Rockland lacks

adequate protection and there is virtually no equity left in the Properties.  For reasons given

further below, Rockland specifically requests emergency relief with respect to the 45 South

Street Property.

Rockland also requests that this Court order the immediate appointment of a trustee

pursuant to Section 1104 of the Bankruptcy Code on grounds of incompetence, gross

mismanagement and self-dealing.

1164075/3/16133/3

Should this Court for any reason not grant relief from stay to Rockland or appoint a trustee, Rockland requests that this Court terminate exclusivity pursuant to Section 1121 of the Code. Rockland will then file a third-party plan of reorganization which will bring this case to a rapid conclusion and will propose a 100% dividend to all creditors plus contract or statutory interest no later than the first anniversary of the effective date of such plan.

## SUMMARY

**Emergency Relief with Respect to 45 South Street Property**

1.      On August 9, 2010, Rockland conducted a site inspection after receiving a tip that a "stop work order" was posted on the Property, a two-family house. The inspection revealed that the Debtor had completely demolished the second floor without obtaining a building permit, demolition permit, sewer and drainage permit, or fire and smoke permit from the local Waltham authorities, all required by applicable law. Nor did the Debtor have any formal architectural or engineering plans or specifications prior to commencing this work.

2.      Upon learning of Rockland's planned site visit, the Debtor scrambled to cover his tracks. He immediately hired a new contractor to fill out an application for a building permit, which, on information, appears to have just been completed on the day of the inspection. The second floor had already been completely gutted in a manner posing serious fire and other hazards to the tenants occupying the first floor, including a young child with access to an unprotected staircase leading to the second floor.

3.      Rockland specifically requests emergency relief with respect to this Property because of the reckless and illegal renovation work undertaken by Lupo. Lupo's work violates the mortgage as well as applicable law, presents an ongoing hazard to the tenants and neighbors,

and threatens Rockland's interest in its collateral.  As of the filing of this Motion, despite

request, Lupo has failed to identify the person or contractor who performed the demolition work.

4.      The foregoing cannot be excused as a mistake or simple misunderstanding.

Before being disbarred by the SJC, Lupo practiced real estate law for many years.  He also has

been managing and renovating real properties for decades.  He knows the requirements of the

law.

**All Other Properties**

5.      On the Petition Date, Rockland's interest in its collateral was adequately protected

by a $500,000 equity cushion on a fair market value basis.  Through Lupo's obstinacy, gross

mismanagement, self-dealing and other reckless misconduct, the equity cushion appears to have

completely vanished on a liquidation valuation.  Furthermore, the Properties continue to generate

negative operating income (before debt service), largely through Lupo's use of the Properties to

warehouse his pianos without paying rent.  Lupo's continued mismanagement and self-dealing is

now jeopardizing Rockland's interest in the Properties to the point where Rockland is no longer

protected by an equity cushion.  Accordingly, Rockland is entitled to relief from stay due to lack

of adequate protection.

6.      Rockland intends to assert an administrative priority claim in connection with any

losses suffered by it as a result of Lupo's misconduct as a debtor in possession.

**Appointment of Trustee**

7.      A Trustee should be immediately appointed to manage all properties in

accordance with applicable law and with due regard to the best interests of the creditors.  A

number of parties have attempted to bring to this Court's attention the irresponsible and/or illegal

1164075/3/16133/3

conduct of the Debtor, including Rockland and the United States Trustee. It is now clear that cause exists to appoint a Trustee.

**Termination of Exclusivity**

8.     On the eight-month anniversary of this case, and following two extensions of exclusivity over the objections of Rockland, the Debtor filed a plan of reorganization ("Plan") with no disclosure statement. The Plan proposes to retain possession of the Properties and to service debts on numerous properties notwithstanding that such Properties have been experiencing **negative cash flow before debt service**. It also proposes to pay unsecured creditors over a five-year period. If Rockland is not granted relief from stay and no trustee is appointed, Rockland requests that this Court at least terminate exclusivity so Rockland can file a third-party plan that will, among other things, provide a 100% dividend to creditors with interest as soon as practicable following the effective date of any such plan.

**DETAILED DISCUSSION**

**A.     Lupo's Indebtedness to Rockland**

9.     Lupo's indebtedness to Rockland is evidenced by three promissory notes (the "Notes"). Specifically, on April 28, 1999, Lupo, as Trustee of Lupo Realty Trust, borrowed $550,000 from Charter Bank, the predecessor in interest to Rockland. A copy of the April 28, 1999 Promissory Note for this loan, together with an amendment to the Note and Lupo's personal guaranty, is attached hereto as Exhibit A. On December 14, 2001, Lupo, as Trustee of Felton Street Realty Trust, borrowed $740,000 from Chart Bank, formerly known as Charter Bank. A copy of the $740,000 Promissory Note for this loan, together with an amendment to this Note and Lupo's personal guaranty, is attached hereto as Exhibit B. On July 10, 2002, Lupo, as Trustee of the 22 Felton Street Realty Trust, borrowed $620,000 from Chart Bank. A copy of

4

the Promissory Note for this loan, together with an amendment to the Note and Lupo's personal

guaranty, is attached hereto as Exhibit C.

10.     The Note obligations are guaranteed by Lupo, and secured by first mortgages on

all of the Properties (collectively, "Mortgages").  Pursuant to the terms of the Mortgages, the

obligations are cross-collateralized.[1]  As a result of certain transfers of title made on the eve of

bankruptcy , title to all of the Properties were held by Lupo, individually, as of December 10,

2009 (the "Petition Date").  Copies of the five Mortgages for the Properties, in the order listed

above, are attached hereto as Exhibits D - H, respectively.

11.     Each of the Notes is in default and was in default as of the Petition Date.  As of

the Petition Date, the Debtor was indebted to Rockland in the amount of $1,891,651, inclusive of

principal, interest, and legal fees and other costs of collection, as follows:

| | |
|---|---|
| Original Principal Balance on All Notes | $1,580,252 |
| Accrued Interest at Contract Rate (through 6/19/09) | $    45,162 |
| Accrued Interest at Default Rate (6/19/09 – 12/10/10) | $    98,831 |
| Late Charges | $    14,613 |
| Negative Escrow Balance | $    41,891 |
| **Total Principal, Interest, Late Charges On All Notes** | **$1,780,751** |
| Collection Costs and Related Expenses | $  110,899 |
| **Total Claim Through 12/10/10** | **$1,891,651** |

---

[1] Lupo individually is the mortgagor or successor-in-interest to the mortgagor for each of the mortgaged Properties.
The "Mortgage Obligations" section of each mortgage recites that the mortgage secures, inter alia, "all other
obligations … under any other instrument or document given or entered into as security for … the Note."
Accordingly, each mortgage secures each of the three guarantees since (i) each guaranty secures obligations of the
Borrower "now existing or hereafter arising," and (ii) Lupo individually is the successor-in-interest to the
"Borrower" under each Note.

5

This indebtedness is further detailed in the Attachment to Rockland's Proof of Claim, a copy of

which is attached hereto as Exhibit I.  Interest continues to accrue at the per diem default rate of

$568.138.  The costs of collection also have increased since December 10, 2009.  As of August

12, 2010, the Debtor's indebtedness to Rockland now exceeds $2,050,000, inclusive of

postpetition legal fees.

**B.      The Value of the Properties**

12.      Rockland has obtained written fair market value appraisals for each of the

Properties as of January 28, 2010 (the "Appraisals").  According to the Appraisals, the fair

market value of the Properties is $2,420,000, broken down as follows:

| | |
|---|---|
| 45 South Street | $360,000 |
| 719-723 Main Street | $770,000 |
| 22 Felton Street | $380,000 |
| 91 Felton Street | $540,000 |
| 32 Dartmouth Street | $370,000[2] |

Copies of the Appraisals are attached hereto as Exhibits J-N, respectively.

13.      To the best of Rockland's knowledge, the real estate taxes are current and there

are no other liens on the Properties.

14.      There is no other collateral securing Lupo's indebtedness to Rockland.

15.      None of the Properties is Lupo's primary residence, so no declarations of

homestead are at issue.

16.      As stated above, the Appraisals are at fair market value.  The liquidation value of

the Properties, using a conventional 15% discount off the fair market value, is no more than

**$2,057,000**.  Further, this total property valuation does not take into account the damage done by

the Debtor to the 45 South Street Property.  As set forth below, as a result of Lupo's illegal

---

[2] The Appraisal for 32 Dartmouth Street is as of March 11, 2010.

1164075/3/16133/3

conduct, that dwelling currently is partially demolished and poses a fire and safety hazard.  Its

value, if there is one, cannot be ascertained at this time, but is surely substantially below Petition

Date fair market value.  Rockland estimates the damage at $100,000 which is the approximate

cost to complete the work to restore the second floor premises to rentable condition.

**C.**     **Lupo's Failure to Properly Maintain the Properties and to Comply With
Applicable Legal Requirements**

17.     Lupo has failed to adequately maintain and protect Rockland's interest in the

Properties.  Much of Lupo's willful or reckless misconduct is detailed in the Appraisals

themselves, and in inspection reports obtained by Rockland with respect to the Properties (the

"Inspection Reports") (Exhibits O-R, respectively).[3]  The problems with 45 South Street are

detailed in the Affidavit of Joseph R. Valle ("Valle Aff.") filed herewith.  Set out below is

further detail concerning the negligence, willful misconduct and/or self-dealing of Lupo with

respect to each of the Properties.

### 45 South Street

18.     The property at 45 South Street is a two-family/two-story residential building.  On

or about the Petition Date, Lupo was reporting rent from three tenants.  On August 9, 2010,

Rockland confirmed rumors that Lupo had been illegally performing demolition and construction

work at the Property during the bankruptcy proceedings.  Lupo completely demolished the

second floor and attic space of the dwelling, apparently to convert a two-bedroom apartment into

a four-bedroom apartment on the second floor.  Valle Aff., ¶ 4.  Lupo commenced this work

*without* obtaining a building permit, demolition permit, sewer and drainage permit, or fire and

smoke permit from the local Waltham authorities.  Id., ¶ 5.  All such permits are required in

---

[3] The Inspection Report for 719-720 Main Street is at Exhibit O.  The Inspection Report for 22 Felton Street is at
Exhibit P.  The Inspection Report for 91 Felton Street is at Exhibit Q.  The Inspection Report for 32 Dartmouth
Street is at Exhibit R.

1164075/3/16133/3

order to perform this work.  Indeed, Lupo did not have any formal architectural or engineering plans or specifications prior to commencing this work.  Id.  The Waltham Building Department recently issued a "stop work order" after learning of Lupo's illegal work.  The Waltham Building Department had no permit applications on file as of August 9, 2010.  Id., ¶6.  Based on the observations made by Rockland's consultant, and the exchanges of communications leading up to the site inspection, it appears that Lupo was scrambling to cover his tracks.  As of the date of the inspection, Lupo had only just hired a contractor to fill out a building permit application.  The application was dated August 9, 2010, the same date as the inspection.  As of the filing of this Motion, Lupo has ignored Rockland's informal request to identify the first contractor who did the demolition work.

19.     Currently the property at 45 South Street is in a dangerous and hazardous condition.  Fire stops and rock wool insulation have been removed from the area between each of the floors.  This has created a significant fire hazard at the building.  Valle Aff., ¶7.  There also are no temporary railings or other safety materials in place at the openings on the second floor which create a serious life and safety hazard.  There are residents (including children) on the first floor of the building.  There are no security measures in place to prevent these residents or their guests from accessing the construction site on the second floor where there are dangerous openings in the floor area.  Id.

20.     After being caught by the Building Inspector, Lupo hastily hired a contractor to draw up plans to submit to the Waltham Building Inspector.  Valle Aff., ¶ 6.  These plans are rudimentary and do not conform with the type of plan usually required for a construction project of this magnitude or that is usually accepted by a town building inspector.  Id., ¶ 8.

8

1164075/3/16133/3

21.     Lupo did not only violate legal requirements by failing to seek the necessary permits prior to commencing the work, he also violated his loan covenants with Rockland. Specifically, Section 4.2 of the Mortgage and Security Agreement for the 45 South Street Property provides that the mortgagor "will not … without the prior written consent of Mortgagee, make or permit to be made any alterations or additions to the Mortgaged Property of a material nature."  See Exhibit D, p. 7.  Here, the alterations proposed by Lupo clearly are of a "material nature."  Nonetheless, Lupo deliberately failed to seek Rockland's approval before commencing the work.

### 719 — 723 Main Street

22.     This building consists of a commercial retail piano store on the first floor with an office for Lupo on the second floor.  The building evidences a total lack of regular maintenance. The Inspector noted that the second floor has a ceiling that is falling in and a main carrying beam that is totally rotted and covered with plastic. Exhibit O, p. 1.  The roof requires immediate replacement.  The dormers on the upper roof are rotted as is much of the upper structure and trim throughout the building.  There is significant termite and dry rot damage on the upper roof. Gutters have been blocked (not cleared out) and are not pitched properly.  There is evidence of severe water damage on the exterior.  Id.  The Inspection Report concludes that "[t]his structure has been repeatedly glued together and covered up cosmetically for a long period of time with many years of deferred maintenance."  Id.  The Inspector opined that the required repairs at the property exceed $150,000.  Id., p. 2.  The Appraisal for the property also refers to "[t]he abundance of deferred maintenance that is present…."  Exh. K, pp. 20-21.

1164075/3/16133/3

## 22 Felton Street

23.     This building is a freestanding warehouse used as storage space for Lupo's piano

business.  Lupo's piano company occupies the space rent-free.  In this respect, it is noteworthy

that one of the grounds for Lupo's indefinite suspension from the practice of law by the Supreme

Judicial Court was his self-dealing in respect of family members who had mistakenly trusted him

to treat them fairly.

24.     His responsibilities as a property owner are equally deficient.  The Appraisal

reports that "[t]he exterior appeared unmaintained and in poor physical condition with all

surfaces in need of replacement or finishing."  Exhibit L, p. 19.  The Appraisal also notes a need

for extensive repointing, the existence of rotted window frames and a roof in poor condition.  Id.

The Appraisal concludes:  "No working lavoratories present and the heating system does not

function.  Overall, the building is in an advanced stage of neglect."  Id.  The Inspector also noted,

"many years of deferred maintenance."  Exhibit P, p. 1.  The Inspector concluded that the

building has "structural brick problems" and an "electrical panel that is not in very good shape."

Id.  The Inspector also noticed the absence of any working sprinkler system or fire alarm system

or working bathroom.  The building is "filled with baby grand pianos, chairs, mattresses, doors,

debris, etc."  The Inspector concludes that the "repairs and updating would definitely exceed the

value of the building."  Id.

## 91 Felton Street

25.     This location is a freestanding industrial/commercial building with one

commercial tenant.  Lupo is storing and repairing pianos in another section of the building,

although he pays no rent for that space either.  The Appraisal notes significant deferred

maintenance including rusted steel window frames, mortar joint cracks and a basement heating

10

system that is not properly functioning.  Exhibit M, p. 19.  Over the winter of 2009, purportedly as a result of Lupo's failure to ensure that the building was adequately heated, there was a burst pipe resulting in significant damage to ceilings, lavoratories, and an office in the building.  Id. and Exhibit Q.  The sole commercial tenant at the property threatened to withhold rent as a consequence of Lupo's failure to provide oil deliveries and maintain the building.  See Exhibit S.  The Inspector's Report for this building notes that electrical panel covers are off and plumbing pipes appear to be pitched in the wrong direction.  Exh. Q, p. 2.  The Inspector recommended approximately $70,000 in necessary repairs.[4]  Id., p. 3.

### 32 Dartmouth Street

26.     This property was a single family home that has been converted to a multi-family home consisting of two apartments with 8/9 bedrooms.  Both the Inspection Report and the Appraisal for this property note the absence of smoke detectors or carbon monoxide detectors in violation of applicable code requirements.  Exhibit N, p. 2 and Exhibit R, p. 1.  The Inspection Report also notes that the eaves are full of combustible materials, creating a serious fire hazard.  Exhibit R, p. 1.  There is no rear egress on the second floor and egress from the rear on the first floor is blocked making it difficult for tenants to escape in case of fire.  Id.  In the cellar, the Inspector found a plastic bag filled with asbestos and odd auto parts.  The Inspector concluded that the property was "poorly managed and lends much risk to tenants."  Id., p. 2.  The Appraisal also reports "an abundance of accrued depreciation and possible tenant safety issues, such as lack of adequate smoke detectors."  Exhibit N, p. 2.  The appraised value for this property is "subject to completion of recommended repairs."  Id., p. 7.

---

[4] Approximately $30,000 of these repairs are related to the damage from the burst pipe.  Lupo allegedly has undertaken such repairs, but Rockland currently is not aware of the status of those repairs.

## ROCKLAND'S ENTITLEMENT TO RELIEF FROM STAY
## AND OTHER APPROPRIATE REMEDIES

### A.      Section 362(d)(1) – Liquidation Value as Standard

27.      In determining whether a secured creditor is adequately protected under Section

362(d)(1) for purposes of determining whether the stay should be lifted, a court should consider

the *liquidation or "forced sale" value* of the secured creditor's collateral.  *In re Demakes*

*Enterprises*, 145 B.R. 362, 365 (Bankr. D. Mass. 1992) (Goodman, J.) (foreclosure value used

for adequate protection purposes under Section 362(d)(1)); *In re Ledgemere Land Corp.*, 125

B.R. 58, 61-62 (Bankr. D. Mass. 1991) (Queenan, J.) (unless debtor is intending to sell property,

proper measure of valuation for adequate protection purposes is liquidation value); *In re*

*Robbins*, 119 B.R. 1, 5 (Bankr. D. Mass. 1990) (Queenan, J.) (following "the general rule that

[for adequate protection purposes] a mortgage interest is worth what it will bring at

foreclosure").  *See generally*, J. F. Queenan, Jr., et al, *Chapter 11 Theory and Practice:  A Guide*

*to Reorganization*, § 8.17 (LRP Publications 1994).  Unless the debtor plans to sell the collateral,

"the proper standard for valuation of the security and mortgage interests should be the value

obtainable through a disposition by the secured creditor which is the most commercially

reasonable disposition under the circumstances."  *Demakes*, 145 B.R. at 365 (quoting J. F.

Queenan, Jr., *Standards for Valuation of Security Interests in Chapter 11*, 92 Commercial L. J.

18 (1987).

28.      Since Rockland's claims are cross-collateralized among all five Properties,

Rockland's adequate protection should be evaluated on an aggregate basis.  According to the

Appraisals, the Properties have a combined fair market value of $2,420,000.  After applying a

conventional 15% discount for forced-sale/liquidation, the liquidation value as of the Petition

Date was $2,057,000.  That gave Rockland an equity cushion of approximately $165,000 as of

12

the Petition Date on a liquidation value basis. Since then, approximately $140,000 of interest has

accrued, plus legal fees, and at least one Property has suffered some $100,000 in damages. Other

Properties continue to decline in an unquantifiable amount due to continued neglect, gross

mismanagement and self-dealing on the part of Lupo. The equity cushion for adequate

protection purposes has therefore been completely wiped out, and Rockland remains exposed

with respect to Lupo's continued gross mismanagement and self-dealing.

29.      Accordingly, Rockland lacks adequate protection with respect to its interest in the

Properties and is therefore entitled to relief from stay under Section 362(d)(1).

**B.      Section 362(d)(2) – Fair Market Value as Standard**

30.      In determining whether a debtor has equity in the collateral for Section 362(d)(2)

purposes, courts generally look to the fair market value. See J. F. Queenan, Jr., et al, Chapter 11

Theory and Practice: A Guide to Reorganization, § 8.17 (LRP Publications 1994) ("Because

section 362(d)(2)(A) contains no reference to the value of the creditor interests, there is no

reason to depart from the usual valuation standard of fair market value when applying it"); *see

also*, *Sutton v. Bank One, Texas Nat'l Assoc.*, 904 F.2d 327, 329-30 (5th Cir. 1990) (applying fair

market value).

31.      If the debtor has very little equity even on a fair market value basis and there is no

reorganization in prospect, relief from stay is appropriate where the equity is rapidly diminishing

through the accrual of interest and real estate taxes. *Guarantee-First Trust Associates, Inc. v.

Accent Associates, Inc., (In re Accent Associates, Inc.)*, 8 B.R. 933, 935 (Bankr. D. Mass. 1981)

(granting relief from stay where the debtor had, at best, only $118,000 of equity in collateral); *In

re Matter of 4-R Management, Inc.*, 208 B.R. 232, 238 (Bankr. N.D. Ala. 1997) (lifting stay

13

where "there is little or no equity" in the collateral). *See generally*, *In re Winthrop Old Farm Nurseries*, 50 F.3d 72 (1st. Cir. 1995) (discussion of valuation for Section 506(a) purposes).

32.    Those are precisely the circumstances here.  As of the Petition Date, Rockland had an equity cushion of approximately $500,000 on a fair market value basis – without regard to the impact of prolonged deferred maintenance on fair market value.  During the ensuing eight months of the case, because of the gross management, neglect and self-dealing on the part of Lupo, the Properties have generated only negative cash before debt service.  Approximately $160,000 of interest has accrued (plus postpetition legal fees), one Property has suffered some $100,000 in damages, and other Properties are declining in value in an as yet unquantifiable amount.  Accordingly, the equity cushion, if one remains, is at best negligible at this point.

33.    The Debtor's Plan, filed without a disclosure statement, has no reasonable prospects of success.  The Debtor cannot reasonably expect unsecured creditors to accept a five-year payout; the plan to raise cash is grossly inadequate to fund the actual cash needs of the Plan; and the Debtor lacks sufficient net operating income on his properties to service the secured debts he proposes to cramdown.

34.    Accordingly, Rockland is entitled to relief from stay pursuant to Section 362(d)(2) of the Code.

C.    **Appointment of a Trustee**

35.    A trustee should be appointed without further delay.  These eight months of postpetition activity demonstrate Lupo's contempt for legal requirements, gross management, neglect, and disregard for the interests of the general public and his creditors.  A trustee should be immediately appointed so that a single responsible person will manage the estate's properties to a successful conclusion.

1164075/3/16133/3

36.     Moreover, Lupo's conduct throughout these proceedings demonstrate a contempt for the requirements of operating his business in accordance with applicable non-bankruptcy law as required by 28 U.S.C. § 959(b).  This is consistent with the character revealed in the SJC's decision to indefinitely suspend Lupo's license to practice law.  A trustee should be appointed to ensure that the business is operating in accordance with applicable state law.

**D.     Termination of Exclusivity**

37.     Should this Court deny relief from stay to Rockland and decline to appoint of a trustee, Rockland requests that the Court immediately terminate exclusivity pursuant to Section 1121 of the Code.  Under such circumstances, Rockland stands ready, willing and able to propose a third-party plan which will assure that all creditors, secured and unsecured,  priority and non-priority, will receive 100% of their allowed claims, with statutory or contract interest, as applicable, within the first anniversary of the effective date of such plan.  This is substantially better and much more easily achievable than anything the Debtor is proposing in his plan. Creditors should have an opportunity to choose among such competing plans.

WHEREFORE, Rockland Trust Company respectfully requests that this Court enter an Order:

(1)     Granting it relief from stay to take possession of and/or foreclose its Mortgages on the Properties, substantially in the form of Order attached hereto;

(2)     Granting it emergency relief from stay to take immediate possession of and/or foreclose its Mortgage on the Property located at 45 South Street, Waltham;

(3)     Appointing a Chapter 11 Trustee;

15

1164075/3/16133/3

(4)    In the alternative, terminating exclusivity; and

(5)    Granting such other and further relief as is just and proper.

ROCKLAND TRUST COMPANY

By its attorneys,

/s/ David J. Reier
David J. Reier (BBO No. 546202)
Nicholas J. Nesgos (BBO No. 553177)
POSTERNAK BLANKSTEIN & LUND LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-8004
Tel:  617-973-6100
Fax: 617-367-2315
E-mail:  dreier@pbl.com

Dated: August 15, 2010

## CERTIFICATE OF SERVICE

IT IS CERTIFIED that the foregoing document was filed this 15th day of August, 2010 through the ECF filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by hand delivery on August 16, 2010 to the taxing authority for the Town of Waltham, Treasurer/Collector's Office, 610 Main Street, Waltham, MA 02452, and Robert N. Lupo, 89 Sudbury Road, Weston, MA 02493.

/s/ David J. Reier

1164075/3/16133/3