UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re | ) | |
| | ) | |
| ROBERT N. LUPO, | ) | CHAPTER 11 |
| | ) | CASE NO. 09-21945-WCH |
| Debtor | ) | |

## REPORT OF EXAMINER

Mark G. DeGiacomo, the duly appointed Examiner of the above captioned bankruptcy estate (the "Examiner") hereby submits the following report:[1]

## I. Introduction

On December 10, 2009, Robert N. Lupo (the "Debtor") filed a voluntary petition pursuant to Chapter 11 (the "Petition Date"). Since the Petition Date the Debtor has operated as a Debtor-in-Possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. On June 29, 2010, this Court entered an Order requiring that the Office of the United States Trustee appoint an examiner to report as soon as possible concerning matters referenced in Section 1106(a)(3) and (4) of the Bankruptcy Code. Section 1106(a)(3) and (4) require an examiner to:

> "(3) . . . investigate the acts, conduct, assets, liabilities and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formation of a plan. . . and
>
> (4)(a) file a statement of any investigation conducted under paragraph (3) of this subsection including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate".

---

[1] After consultation with the Office of the United States Trustee, the Examiner has endeavored to draft and submit this Report prior to the hearings scheduled before this Court on August 18, 2010. While the Examiner has attempted to include his findings on all of the matters referenced in 11 U.S.C. § 1106(a)(3) and (4), he stands ready to continue his investigation and supplement this Report concerning any issues the Court may want investigated.

## II.  The Investigation

In connection with his investigation of the Debtor, the Examiner conducted lengthy

interviews of the Debtor on July 14, 2010 and August 11, 2010, conducted a lengthy interview of

Lisa Jacobs on July 7, 2010, conducted a site visit on August 9, 2010 of several of the Debtor's

real properties, inspected several of the Debtor's more valuable motor vehicles, reviewed

hundreds of pages of pleadings and documents filed in this case and in other cases that were filed

in various State Courts, had telephone calls with several city and town officials concerning the

Debtor's real estate holdings, met with and had telephone calls with several of the Debtor's

tenants, reviewed documents at several Registries of Deeds, the Registry of Motor Vehicles, the

Office of the Massachusetts Secretary of State and the Office of the Massachusetts Attorney

General, reviewed real estate appraisals, conducted fact research on the internet concerning

several issues, had numerous telephone calls and e-mail exchanges with several attorneys who

represent parties in this case and reviewed material provided by Verdolino & Lowey, the

Debtor's accountants.

## III.  The Debtor

As noted above, the Examiner conducted two lengthy interviews of the Debtor.  The

Examiner feels that the Debtor was very forthcoming during both of these interviews although he

was very slow when it came to producing documents that were requested at the conclusion of the

July 14, 2010 interview.  The Examiner believes that it was only due to the efforts of Attorney

Ruttenberg that the majority of the documents finally were turned over – weeks after they were

requested.  Attorney Ruttenberg has been extremely responsive to all of the many requests made

by the Examiner throughout this investigation.

The Examiner feels that during the lengthy interviews he conducted with the Debtor, the

Debtor answered all the Examiner's questions and appeared to do so in a candid and forthright

2

manner. The Examiner considered but rejected the idea of taking the Debtor's Rule 2004

Examination. It is the Examiner's view that since all parties in interest would likely be able to

attend and question the Debtor at a Rule 2004 Examination such an examination had the

potential of turning into a circus and not being nearly as helpful to the Examiner as were the

private interviews.

The Debtor is 64 years old. In 1974, the Debtor became a member of the Massachusetts

Bar and until September, 2006 he practiced law in Waltham, Massachusetts, first with his

father's firm, Lupo & Lupo, and later as a sole practitioner. The Debtor's law practice primarily

concentrated in the area of representation of parties in connection with residential real estate

transactions. On July 28, 2006, the Supreme Judicial Court entered a Judgment pursuant to

which the Debtor was indefinitely suspended from the practice of law (a copy of the Supreme

Judicial Court decision is attached as Exhibit D to the Opposition of Rockland Trust Company to

Second Motion by Debtor for Extension of Exclusivity (Doc. 176)). In general, the Supreme

Judicial Court found that in connection with two separate incidents the Debtor engaged in "clear,

personal conflicts of interest with elderly, unsophisticated and vulnerable clients" and that his

"conduct reflects an insensitivity to his obligation of absolute fiduciary fidelity to those whom he

counseled, combined with a pattern of self-dealing and self-enrichment at their expense".

Although the Debtor is entitled to apply for readmission, he has yet to do so. The Debtor was

represented by counsel during the underlying Board of Bar Overseers hearings and before the

Supreme Judicial Court. The Debtor feels <u>very strongly</u> that an injustice was done to him by

both the Board of Bar Overseers and the Supreme Judicial Court. The Examiner did not spend

the time necessary to fully understand the basis for the Debtor's views on this subject.

In addition to his law practice, the Debtor began purchasing real estate in 1968. Since

then he has bought, either personally or through a trust, thirty-three parcels of real estate (See

3

Section IV (A) of this Report for a full discussion of the Debtor's real estate). Although the

Debtor is a buyer of real estate he is not necessarily a seller. The only real estate the Debtor has

ever sold was his first home which he sold in 1983. As a result, on the Petition Date, the Debtor

owned either directly or through a trust, a total of thirty two parcels of real estate, all but seven of

which are properties he rents to residential tenants. The Debtor runs his real estate business from

an office located at 721 Main Street in Waltham, Massachusetts, one of the three commercial

buildings owned by the Debtor. The Examiner confirmed with the Office of Consumer Affairs

& Business Regulation for the Commonwealth of Massachusetts, Division of Professional

Licensure (the "Licensure Division"), that the Debtor became a licensed real estate broker on

January 1, 1975, and that his license has not been suspended. According to the Licensure

Division, no disciplinary actions have been taken concerning the Debtor's license since at least

1993 (the last date available on the Licensure Division's website).

In addition to his real estate business, the Debtor also is the owner and operator of The

Piano Man, Inc. The Piano Man, Inc. ("Piano Man") is a Massachusetts corporation which was

incorporated in 1993. Piano Man is in the business of buying, refurbishing and selling pianos

(See Section IV(E) of this Report for a full discussion of the Piano Man).

## IV.  Assets

## A.  Real Estate Holdings

Schedule A of the Debtor's original schedules to his bankruptcy petition (the "Original

Schedules") list the Debtor's interest in twenty three parcels of real estate (the "Debtor Owned

Real Estate"). Although the Original Schedules were filed over a month after the Petition Date,

the Debtor provides a dollar amount for the fair market value of the his interest in only five of

these twenty three parcels. He lists the value of the other eighteen properties as "undetermined".

4

In response to Question 35 of Schedule B of the Debtor's bankruptcy petition, the Debtor lists his interest in seven real estate trusts, each of which the Debtor advised the Examiner owns one or more parcels of real estate. The Debtor listed "unknown" as the current value of his interests in <u>all</u> of these trusts. Seven months after the filing of the Original Schedules, the Debtor a licensed broker who has been in the business of purchasing and managing his real estate holdings for many years, still has not amended his Original Schedules to provide a fair market value of the real estate listed on Schedule A or the fair market values of his interests in the trusts which are disclosed in Schedule B.

### i. Debtor Owned Real Estate

The twenty three parcels of real estate, title to which stand in the Debtor's name, are comprised of the Debtor's home located at 89 Sudbury Road in Weston, Massachusetts (owned as tenants by the entirety with his wife), a vacation home located at Winaukee Extension, Moultonboro, New Hampshire (owned solely by the Debtor), a single family house located at 221 Tower Road in Lincoln, Massachusetts which until recently was occupied by one of the Debtor's daughters and her husband (owned as tenants by the entirety with his wife), a single family home the Debtor bought for one of his daughters while she attended college located at 9 Sky Harbor Drive in Biddeford, Maine (owned as tenants by the entirety with his wife), a single family house located at 402 Parker Street, Newton, Massachusetts (owned as a joint tenant with Peter Collins), four additional single family houses, five four family houses, three two family houses, five residential condominiums and three commercial buildings.

The Examiner did not deem it necessary to incur the expense of hiring an appraiser to conduct appraisals of all of the Debtor's properties. The Examiner has however reviewed several existing appraisals as well as the tax assessments for all of the properties. The Examiner has also discussed the value of each property with the Debtor. Based on these efforts the

Examiner believes that the Debtor has equity, over and above mortgages and the Debtor's

homestead, in as many as nineteen of the twenty three Debtor owned properties totaling

approximately $3 million.[2]

Approximately twenty three of the currently occupied forty housing units owned by the

Debtor are occupied by so-called Section 8 tenants under the supervision of various town

housing authorities. The Debtor has advised the Examiner that he often times prefers to rent to

Section 8 tenants because although their rent is set below fair market rental value, a significant

portion of the rent is paid by the housing authorities and therefore all but guaranteed. The

Debtor has indicated that the "guarantee" of rent is a sufficient trade-off for the lower amount of

rent he would receive from Section 8 tenants.

### ii. Real Estate Trusts

In response to Question 35 on Schedule B of the Debtor's Original Schedules, the Debtor

disclosed his interest in seven real estate trusts. Two months later, when he filed his Amended

Schedules, the Debtor added an eighth trust, the Mashpee Realty Trust. The Debtor was the

settler of six of these eight trusts (the "Family Trusts").[3]

Four of the Family Trusts are revocable by the Debtor (the "Revocable Trusts"). The

Revocable Trusts are: the RN Lupo Family Trust (owner of 700 Boston Post Road, Weston,

Massachusetts), the Linwood Family Trust (owner of 236 Linwood Avenue, Newton,

---

[2] Given the number of properties involved, the fact that interest on the many over secured loans continues to accrue, and the changing market, the Examiner's estimate of combined fair market value could be off by several hundred thousand dollars either way. However, since even at the most conservative estimates the equity in the Debtor's assets far exceeds the maximum amount of claims that could be allowed in this case, the Examiner determined not to request the employment of an appraiser to help determine with more precision the amount of equity in each property.

[3] These trusts do not include the following trusts which the Debtor revoked on the Petition Date, each of which owned one parcel of real estate: the 22 Felton Street Realty Trust, the 91 Felton Street Realty Trust and the 721 Main Street Realty Trust (the "Revoked Trusts"). The real estate previously owned by the Revoked Trusts is listed on Schedule A to the Debtor's bankruptcy petition.

2049704v1

Massachusetts), the 25 Melville Avenue Family Trust (owner of 25 Melville Avenue, Newton,

Massachusetts) and the Tower Realty Trust (owner of 131 Tower Road, Lincoln, Massachusetts).

The real estate owned by each of the Revocable Trusts constitutes property of the bankruptcy

estate In re Beatrice, 296 B.R. 576 (B.A.P. 1st Cir. 2003. The Examiner estimates that there is

approximately $500,000.00 in equity in the real estate owned by the Revocable Trusts.[4]

The four remaining Family Trusts each require a detailed explanation:

A.      Lupo Edgewater Realty Trust. This trust owns the real estate located at 10

Edgewater Park, Newton, Massachusetts. The assessed value for this real

estate is $359,100.00. This real estate is not encumbered by any liens or

mortgages. The trustees are the Debtor and Ken Lopez. The Debtor is a 50%

beneficiary of this trust and the M. Adeline Lupo Revocable Trust, which

contains a spendthrift provision, holds the other 50% beneficial interest. The

declaration of trust provides that the trust maybe amended with the consent of

the trustees and beneficiaries and it may be terminated on the request of any

beneficiary.

B.      N&A Realty Trust. This trust owns the parcels of real estate located at 97

Hamilton Road, Waltham, Massachusetts and 29 Myles Standish Road,

Weston, Massachusetts. The combined assessed values of these properties is

$1,423,400.00. These parcels of real estate are not encumbered by any liens

or mortgages. This trust contains a spendthrift provision. The trustees of this

trust are the Debtor and Ken Lopez. The beneficiary of this trust is the M.

Adeline Lupo Revocable Trust which has a spendthrift provision (see below).

Both parcels of real estate are unencumbered. The declaration of trust

---

[4] See footnote 2.

provides that the trust may be amended by a majority of the trustees and it may be terminated by any beneficiary.

C.   <u>Mashpee Realty Trust</u>. This trust owns unimproved lots known as 28 and 33 Nehoiden Road, Mashpee, Massachusetts. The lots have a combined assessed value of $424,000. Neither of these lots are encumbered by liens or mortgages. The Debtor is the trustee of this trust. The beneficiary of this trust is the M. Adeline Lupo Revocable Trust. The declaration of trust provides that the trust may be amended with the consent of the beneficiaries and the trustee and it may be terminated by any beneficiary.

D.   <u>M. Adeline Lupo Revocable Trust</u>. The settler of this trust was the Debtor's mother. The Debtor is now the sole trustee. The trust holds 50% of the beneficial interest in the Lupo Edgewater Realty Trust and 100% of the beneficial interest in the N&A Realty Trust. The Debtor is the sole trustee of this trust. The beneficiaries of this trust are two subtrusts created by it. The Debtor is the beneficiary of one of these subtrusts and his sister is the beneficiary of the other subtrust. The declaration of trust includes a spendthrift provision.

The Debtor advised the Examiner that to the best of his memory no distributions have ever been made to any of the beneficiaries of any of the Family Trusts. As detailed below and as detailed on Exhibit A, each of the Family Trusts owns at least one parcel of real estate which is currently being leased with the exception of the Mashpee Realty Trust which owns two vacant lots and the M. Adeline Lupo Revocable Trust which owns no real estate. Prior to the Petition Date, all income from the Family Trusts with the exception of the income from the Lupo Edgewater Realty Trust, was deposited in the Debtor's operating account at RTN Bank along

with all income received from the Debtor Owned Real Estate. All expenses for the Family Trusts and the Debtor Owned Real Estate, again with the exception of the Edgewater Realty Trust, were paid from the operating account at RTN Bank.

### iii.  Cash Flow

The Examiner has attached hereto as Exhibit A a chart prepared by the Debtor's accountants, Verdolino & Lowey, indicating among other things the estimated monthly expenses for each income producing property based on the expenses incurred during the first three months of the bankruptcy, the net income before debt service and the amount of the debt service plus real estate taxes which would be due currently pursuant to the terms of the promissory notes which are secured by the mortgages on each of the Debtor's income producing properties. The chart also lists the estimated tax basis which in some cases is quite low indicating that if these properties were sold a substantial capital gains tax would be incurred thereby reducing the equity available to creditors.

While there is substantial value in the Debtor's real estate that far exceeds the claims filed against this bankruptcy estate, many of the properties have a negative cash flow even before any debt service or real estate taxes are paid and many more will have a negative cash flow even if real estate taxes and interest only is paid to the holders of secured claims against the particular properties.

### B.  Motor Vehicles

### i.  The Originally Scheduled Vehicles

Schedule B of the Debtor's Original Schedules disclosed his 100% interest in a total of eight motor vehicles (the "Originally Scheduled Vehicles"). Although the Debtor included on Schedule B his opinion of the fair market value of each vehicle, in each instance the value listed appears to be lower than even the conservative "trade in" value listed by Kelly Blue Book or

2049704v1

NADA (See attached Exhibit B). As indicated in Exhibit B, the combined fair market value of the Originally Scheduled Vehicles is approximately $49,425.00, approximately $24,100.00 more than the total of the amounts listed by the Debtor on Schedule B to his bankruptcy petition.

Based on his review of the titles for all of the Originally Scheduled Vehicles, the Examiner has determined that of the Originally Scheduled Vehicles only the 2003 Toyota MR2 is encumbered by to a lien (in the amount of approximately $5,800 (see Claim No. 31)).

### ii. The Undisclosed Vehicles

After the United States Trustee was advised by a creditor that the Debtor actually owned more motor vehicles than he had scheduled, the Debtor filed an amended Schedule B on March 15, 2010, in which he added an additional seven vehicles (the "Undisclosed Vehicles"). The Undisclosed Vehicles are: a 1932 Chevrolet, a 1964 Studebaker Daytona, a 1965 Mustang, a 1982 BMW, a 1986 Vixen Motor Home, a 1984 Datsun, and a 1998 Ford Crown Victoria. Although the fair market values of the Undisclosed Vehicles can be easily determined by the use of various well known internet sites, the Debtor listed the value of six of the seven Undisclosed Vehicles as "unknown" and has not sought to further amended Schedule B to provide the values of the other six vehicles.

The Debtor claims that six of the seven Undisclosed Vehicles were not originally scheduled because he felt that these vehicles were owned by the Piano Man and not him individually[5]. In response to questioning by the Examiner the Debtor indicated that these six Undisclosed Vehicles, as well as the originally scheduled 1981 BMW, had been purchased at an auction in New Hampshire (the "NH Vehicles"). The Debtor indicated that he intended to use

---

[5] The Debtor indicated that the 1998 Ford Crown Victoria was not originally scheduled because although it is titled in his name he felt it was his mother's. As discussed in Section IV(F) of this Report, this vehicle was sold post-petition by the Debtor without court approval.

10

the NH Vehicles in connection with marketing efforts for the Piano Man although he also

indicated that he had never actually done so.  He indicated that the total purchase price for the

NH Vehicles was $90,000.00, of which $15,000.00 was paid by a check from the Debtor's bank

account and $76,799.69 was paid from the proceeds of a personal unsecured loan the Debtor had

obtained from RTN Federal Credit Union (the "Undisclosed Auto Loan").  The Piano Man was

not an obligor or a guarantor of the Undisclosed Auto Loan.  The bills of sale for the NH

Vehicles indicate that each of the NH Vehicles was "sold to" the Debtor. [6]  The Debtor has

provided the Examiner with copies of the Declaration Pages for his personal automobile

insurance policies which indicate that the insured party for all of the NH Vehicles is the Debtor

not the Piano Man.  The only evidence presented to the Examiner in support of the Debtor's

claim that the NH Vehicles belong to the Piano Man is a handwritten assignment of four of the

seven NH Vehicles on Piano Man stationery (the "Alleged Assignment") (Attached hereto as

Exhibit C is a copy of the Alleged Assignment).  The Debtor advised the Examiner that although

he added the NH Vehicles when he filed his amended Schedule B he still believes based on the

Alleged Assignment, these vehicles belong to Piano Man.[7]

The Examiner has examined the titles for all of the Undisclosed Vehicles that are titled

vehicles and reviewed the UCC filings at the Office of the Secretary of State for the

Commonwealth of Massachusetts.  As a result of a review of these records the Examiner has

determined that none of the Undisclosed Vehicles are encumbered by any lien or security

interest.

Based on the NADA Guides, the Examiner believes the combined fair market value of

---

[6] The Debtor did not provide a bill of sale for the 1932 Chevy but he advised the Examiner that the bill of sale for that vehicle was also in his name.

[7] The Examiner notes that the Piano Man's stationery on which the June 13, 2002 Alleged Assignment is written is very different from the Piano Man stationery that was used for a letter dated February 27, 2002, and two letters which appear to have been written to insurance companies shortly after the purchase of the NH Vehicles

2049704v1

the Undisclosed Vehicles is $80,311.000.

### iii.  Other Vehicles

The Debtor has provided the Examiner with evidence that title to four additional vehicles is in the name of Piano Man, Inc.  These vehicles are comprised of a Ford 350, a Chevrolet Silverado pickup truck, a Saturn and a 1999 GMC (the "Piano Man Vehicles").  The Examiner has been unable to verify the Debtor's allegation that the funds used to purchase, maintain and pay any debt service on the Piano Man Vehicles was generated by the Piano Man.

The Debtor also provided the Examiner with evidence that a 2005 Prius and 2001 Chevrolet Suburban are titled to his wife.

**The Debtor should have provided more accurate values for the Originally Scheduled Vehicles.  There is no reason the Debtor could not have listed the fair market values of the Undisclosed Vehicles in his Amended Schedule B.  There appears to have been no legitimate basis for the Debtor's contention that the NH Vehicles are assets of the Piano Man and not his personal assets and therefore property of the bankruptcy estate.  The NH Vehicles should have been listed as the Debtor's assets in his Original Schedules and they should be deemed to be owned 100% by the Debtor for all purposes.**

### C.  Furniture

In response to Question 4 of Schedule B of the Debtor's bankruptcy petition, the Debtor responded that he and his wife jointly own "household goods and furnishings, including audio, video and computer equipment" and that his interest in these assets had a value of $1,000.  A creditor advised the United States Trustee in December, 2009 that the Debtor actually owned a very substantial amount of furniture that was being stored in two of his commercial properties.

In response to questioning by the Examiner, the Debtor indicated that when the Piano Man sold pianos it often did so by exchanging the new piano for the buyer's existing piano as

2049704v1

well as various pieces of the buyer's furniture. The Debtor advised the Examiner that as a result of these types of transactions, the Piano Man owns approximately two hundred fifty pieces of furniture which are stored at 22 Felton Street and 91 Felton Street in Waltham (the "Furniture"). The Debtor indicated that none of his funds were ever used to purchase any of the Furniture.

The Examiner conducted a site visit at both 22 Felton Street and 91 Felton Street where he observed that there were in fact approximately two hundred fifty pieces of furniture, the vast majority of which the Examiner would categorize as "used furniture", at best, as opposed to antiques with any real value. Based on the Examiner's experience he believes that the Furniture as a whole has a value of no more than $5,000 and that many pieces are in such disrepair that they have no value at all. Given the Examiner's observations he determined that the cost of employing an appraiser was not justified.

**While the Examiner has not confirmed that the Debtor's funds were never used to purchase any of the Furniture, the Debtor's contention concerning the manner in which the Furniture was purchased seems to be credible. Given the value of the Furniture the Examiner did not pursue the ownership issue any further.[8]**

### D.  Litigation

Allegations have been made before this Court both orally and in certain pleadings that the Debtor has a propensity to bring and prosecute frivolous litigation. In response to Question No. 21 of Schedule B of the Debtor's bankruptcy petition, the Debtor listed a total of four parties against whom he feels he has at least "potential" claims. The four claims are comprised of claims against Rockland Trust Company (the "Rockland Trust Claim"), Bowdith & Dewey LLP, Rucci, Bardaro & Barrett, P.C. and John Johnson. When the Debtor filed his Amended Schedule

---

8 Although the Examiner is of the opinion that the there is limited value in the Furniture, the fact that the Piano Man has paid very little rent for the storage of the Furniture at the Debtor's real estate located at 22 Felton Street and 91 Felton Street in Waltham, is an issue (See Section IV(F)(iii) of this Report).

2049704v1

B he added Fine Finish to this list. When the Examiner asked the Debtor whether there were any other claims the Debtor could bring against other parties, the Debtor responded "I believe there are, I stay up at night thinking about claims I could bring". The Debtor declined to name any other potential claims and indicated that he has not contacted any attorneys in connection with representation concerning any additional claims. The Debtor did tell the Examiner on more than one occasion that he believes he has been poorly represented by approximately ten lawyers and he might have claims against at least some of them.

### i. Rockland Trust Company

On August 17, 2009, the Debtor filed a complaint with the Middlesex Superior Court against Rockland Trust Company ("Rockland"). In the Complaint the Debtor seeks recovery from Rockland based on the theories of fraud in the inducement, violation of Massachusetts General Law, Chapter 93A, interference with advantageous business relationships and unjust enrichment in connection with the three loans he had taken out from Rockland's predecessor, Chart Bank. In the Complaint the Debtor alleges that he entered into each of the loans, and kept his loans, with Chart Bank and its successors based on promises made by bank employees that the bank would send the Debtor "business in the form of real estate closings." The Complaint also alleges that Rockland is liable to the Debtor due to its: (a) failure to advance $80,000 from the third of the three loans and (b) the bank's failure to release additional collateral given for the last two loans in the form of second mortgages on other properties.

The Examiner notes that on June 7, 2010 the Debtor filed his Second Motion to Extend the Exclusive Periods for Filing and Soliciting Votes for a Plan (Document No. 173) which indicates that "the Debtor believes [the claims against Rockland Trust] will materially impact his ability to successfully propound a plan or reorganization" and on June 14, 2010 the Debtor filed his Reply to the Opposition of Rockland Trust Company to Second Motion by Debtor for

14

Extension of Exclusivity (Document No. 201) in which the Debtor states that he believes the

Rockland Claim "has substantial value and will provide further support for his plan."

On June 16, 2010, this Court entered an Order approving the Debtor's employment of

Attorney Stephen R. Follansbee as Special Counsel in connection with the Rockland Trust

Claim. The Application to Employ Special Counsel does not indicate why it was filed six

months after the Petition Date. The Examiner has had lengthy conversations with Attorney

Follansbee and the Debtor as well as Attorneys David Reier and Nicholas Nesgos who represent

Rockland in connection with the Rockland Trust Claim. The Debtor's special counsel has

indicated that he has done very little since being appointed other than an attempt to compile the

case file from the Debtor's previous attorneys. The Examiner has also reviewed all relevant

pleadings in the Rockland Trust litigation.

### a.  Promise of Business

The promise by Chart Bank to send business to the Debtor was allegedly made prior to

the first loan which was extended on April 28, 1999 (the "First Loan"). Although the Complaint

indicates that Chart Bank never sent any real estate closings to the Debtor after the First Loan[9],

two and a half years later on December 14, 2001, after allegedly being promised that Chart Bank

would send him real estate closings brought to the bank by a broker whom the Debtor introduced

to the Bank, the Debtor entered into the second loan transaction with Chart Bank. Although the

complaint indicates that the Debtor still did not receive any of the alleged promised business

from Chart Bank, seven months later, on July 22, 2002, the Debtor entered into a third mortgage

transaction with the Bank. After entering into this third transaction with Chart Bank the

Complaint alleges that the Debtor was again promised first by employees of Chart Bank and then

---

[9] During questioning by the Examiner the Debtor contradicted this statement in the Complaint and said that a few
closings were sent to him.

15

by employees of Benjamin Franklin Bank, which had merged with Chart Bank, that business would be sent to the Debtor. The Complaint alleges that no business was ever sent his way.

### b.  Failure to Advance

The parties do not dispute the fact that although the promissory note evidencing the third loan is in the amount of $700,000, only $620,000 was advanced. The parties also agree that the only documents concerning the method by which the $80,000 was to be distributed was a commitment letter which states "$80,000 for rehab (hold until construction verified)" and the HUD Financing Statement which indicates that only $620,000 of the $700,000 loan amount was being advanced. Rockland Trust's attorney advised the Examiner that the arrangement was that upon completion of certain work to be done at 22 Felton Street, the Debtor needed to present evidence to Chart Bank that the work had been completed and after an inspection done by Chart Bank funds would be disbursed. According to Rockland, the Debtor made one request that funds be disbursed and after being told that he needed to present evidence of this fact, the Debtor never requested a disbursement again. The Debtor advised the Examiner that the $80,000 holdback was a "placebo" and that the understanding was it would be released after he had been paying the loan for a few months. When asked what, if any, documents he had provided to Chart Bank concerning repair work the Debtor said he never presented any documents to the bank.

### c.  Release of Collateral

The second loan extended by Chart Bank to the Debtor was secured by the Debtor's real estate located at 91 Felton Street and 32 Dartmouth Street both in Waltham, Massachusetts. The third loan extended by Chart Bank to the Debtor was secured by mortgages on 22 Felton Street and 45 South Street also both in Waltham, Massachusetts. Both parties agree that there is no documentation evidencing an agreement by the Bank to release any collateral. The Debtor alleges that Chart Bank agreed to release the mortgage on 32 Dartmouth Street when the Debtor

16

obtained tenants for 91 Felton Street and it agreed to release the mortgage on 45 South Street

when the Debtor obtained tenants for 22 Felton Street. Rockland indicates there was never an

agreement to release collateral.

### d. The Motion for Preliminary Injunction

On or about June 2009, Rockland commenced foreclosure proceedings on the five

properties secured by the three loans. On December 4, 2009, the Debtor filed a Motion for

Issuance of a Preliminary Injunction (the "Preliminary Injunction Motion") enjoining Rockland

Trust from proceeding with its foreclosure sales. In connection with the Preliminary Injunction

Motion, Rockland Trust submitted to the Middlesex Superior Court affidavits of John Mathews,

John Sergi and Rose Buckley, who deny ever making any commitment to the Debtor concerning

Chart Bank providing him with any business. On December 9, 2009, Judge Garry V. Inge of the

Middlesex Superior Court, after having reviewed the Complaint and lengthy memoranda

submitted by both the Debtor and Rockland and after hearing oral argument from both parties,

denied the Preliminary Injunction Motion finding that there was "an insufficient showing of

likelihood of success on the merits". This Chapter 11 case was filed the following day.

**Given the current status of the record in connection with the Rockland Trust Claim
and with the understanding that discovery has not been completed and dispositive motions
been filed or ruled upon, it is the Examiner's view based on all of the above that the
Rockland Trust Claim has little or no value to the bankruptcy estate and that given the
timing of all of the relevant events concerning the Rockland loans through the filing of the
State Court Complaint, the State Court Complaint was filed merely for the purpose of
delaying the foreclosures and in the hope that Rockland may be willing to make some
concessions to avoid the costs of litigation.**

2049704v1

### ii. Bowditch & Dewey

The Debtor has yet to file a Complaint against Bowditch & Dewey. According to the Debtor he hired Bowditch in September of 2009 to take over as his counsel in the Rockland Trust litigation from his original counsel Michael Gillis. The Debtor indicated that he hired Bowditch & Dewey in part because they promised him that they could arrange the refinancing of some of his outstanding loans through the firm's various bank contacts. The Debtor claims that notwithstanding this promise Bowditch & Dewey did not arrange any refinancing for him and that they generally ignored the Rockland Claim and when they filed the Motion for a Preliminary Injunction, which would have enjoined Rockland from proceeding with its scheduled foreclosure sales, Bowditch & Dewey's negligent prosecution of that Motion resulted in the denial of the Motion on December 7, 2009. The Debtor also alleges liability on behalf of Bowditch & Dewey due to the fact that immediately upon the issuance of the preliminary injunction, Bowditch & Dewey indicated that they could no longer represent the Debtor because of a conflict of interest which required the Debtor to obtain new counsel for the filing of his bankruptcy petition which occurred the following day. The Debtor feels that if Bowditch & Dewey truly had a conflict of interest he should have been advised of that fact before they agreed to act as his counsel.

**The Examiner has not undertaken an expansive investigation of this claim since litigation is only contemplated and because attorney-client privilege issues would likely limit information that Bowditch & Dewey would be willing to give to the Examiner. It is, however, the Examiner's view that if this litigation were brought it is unlikely that the Debtor would recover a judgment and if he did it is unlikely that the judgment would be in a substantial amount.**

### iii. Rucci, Bardaro & Barrett, P.C.

The Debtor has not commenced any action against Rucci, Bardaro & Barrett (the "Rucci Firm"), his former certified public accountant. The Debtor indicated that he had paid Rucci Firm a total of $28,000 when he hired them in July of 2009. The Debtor indicates that the Rucci Firm was hired to obtain refinancing and also to prepare and file the Debtor's 2007 and 2008 tax returns. The Debtor indicates that he only spent four hours with people at the Rucci Firm and that the tax returns were never filed. The Examiner has confirmed that Verdolino & Lowey prepared and filed the Debtor's 2007 and 2008 tax returns.

The Examiner has not spent a considerable time investigating this possible claim given that any recovery likely would not exceed the $28,000.00 paid by the Debtor to the Rucci Firm.

### iv.  John Johnson

John Johnson was an attorney of the Debtor who was later disbarred. The Debtor has indicated that he will not be pursuing a claim against Mr. Johnson.

### v.  Wells Fargo Bank

The Debtor had filed a Complaint against Wells Fargo Bank for wrongful foreclosure. The foreclosure never took place and the matter is not now being pursued.

### vi.  Fine Finish

This claim is for unpaid rent and property damage from a tenant who vacated the Debtor's property located at 91 Felton Street, Waltham. The Debtor indicated that Fine Finish moved to a new location and was still in business. The amount sought by the Debtor is $13,000.00. The Debtor indicated that Attorney Arthur Garrity was handling this and other matters. The Examiner notes that the Debtor has not sought to employ Attorney Garrity as special counsel in this bankruptcy case. When questioned on this issue, the Debtor told the Examiner that Attorney Garrity was actually representing the Debtor in two matters and he is representing the Piano Man

19

in another case.  The Debtor claims that, subsequent to the Petition Date, Attorney Garrity has been paid for legal services only by Piano Man.

### E.  The Piano Man

The Debtor owns 100% of the outstanding stock in Piano Man.  Piano Man's business is run out of 721 Main Street, Waltham, Massachusetts, a commercial property owned by the Debtor. The Examiner had asked the Debtor to produce financial statements, balance sheets, tax returns and other documents that would assist the Examiner in determining the value of the Piano Man business and determine its current financial condition.  The Debtor indicated that none of the requested documents were available.

According to a search of the records of the Office of the Massachusetts Secretary of State, the only perfected secured claim against assets of Piano Man is held by the Debtor himself. When questioned about this issue, the Debtor was surprised that a UCCI statement had been filed in his name against Piano Man.  He indicated that while he had put money into the business he had not loaned the business any money.  He noted that the UCCI had been filed on his behalf by Carroll Lowenstein.

In addition to owning pianos, Piano Man also owns a substantial amount of used furniture and several motor vehicles.  According to the Debtor, Piano Man has no debt.

### i.  Inventory

The Examiner believes that the assets of Piano Man are comprised of its inventory, motor vehicles and goodwill.  During his site inspections, the Examiner observed a substantial inventory of new pianos as well as a substantial amount of older pianos in disrepair and many pianos in pieces.  Based on his experience the Examiner believes that if the inventory of the Piano Man were to be liquidated the substantial amount of inventory that is literally in pieces

20

would have absolutely no value  However, the Examiner estimates that the pianos owned by the Piano Man would bring in excess of $100,000.

### ii.  Vehicles

The Debtor has provided the Examiner with evidence that title to four vehicles are in the name of Piano Man, Inc.  These vehicles are comprised of a Ford 350, a Chevrolet Silverado pickup truck, a Saturn and a 1999 GMC (the "Piano Man Vehicles").  According to Kelly Blue Book the Piano Man Vehicles have a total "trade in" value of approximately $12,825.00.  None of the Piano Man Vehicles are encumbered by any lien or security interest.

### iii.  Rent

The Debtor was not able to produce any leases between the Piano Man and the Debtor. According to documents provided by the Debtor to the Examiner, Piano Man is supposed to pay the Debtor rent in the amount of $2,500 a month for the retail space located at 719 Main Street and $1,500 a month for the storage spaces located at 22 Felton Street in Waltham and 91 Felton Street in Waltham.  According to the Debtor's Monthly Operating Reports, a total of $6,500.00 in rent has been paid during the first seven months of this case.[10]  The Examiner also was given two printouts from the Debtor's computer which seemed to indicate that prior to the Petition Date a substantial amount of rent that was due from Piano Man was never paid.  When asked to explain what these documents meant neither Ms. Pirozzi or the Debtor could do so.  The Debtor merely summed up the situation by saying that "when the Piano Man could pay something towards rent it did".

### iv.  Sales Taxes

As noted in Section V(A) of this Report the Massachusetts Department of Revenue has

---

[10] As discussed in Section IV(F)(iii) of this Report, while a mere $6,500.00 has been paid in rent, during the same period the Debtor loaned Piano Man $2,030.00

2049704v1

asserted a priority claim against the Debtor as a responsible party for nonpayment of sales taxes by Piano Man.  When asked about the payment of sales taxes by Piano Man after the Petition Date, the Debtor responded through Attorney Ruttenberg that none had been paid but he believes less than $2,000.00 is due.  Since the Examiner was not provided with any financial records for Piano Man he cannot confirm this amount.

### F. Additional Assets

In response to Question 13 of Schedule B of the Debtor's bankruptcy petition, the Debtor indicated that he had an interest in two Ameritrade accounts.  He indicated that one of these accounts was "held jointly with non-debtor spouse" and had a value of $80,000.00 (the "Joint Account").  He also indicated that he individually owned an Ameritrade account with a value of $50,000.00 (the "Individual Ameritrade Account").  When asked by the Examiner to produce monthly statements for these accounts for the one year period prior to the Petition Date, the Debtor only produced four statements from the Individual Ameritrade Account and five statements from the Joint Account and he indicated these were the only statements he had available.  The June 2010 statement for the Individual Ameritrade Account (the most recent statement provided) shows a balance of $45,310.10 as of June 30, 2010 and the April 2010 statement for the Joint Account (the most recent statement provided) shows a balance of $152,390.55 as of April 30, 2010.  Based on the statements produced, the only unexplained disbursement was a $20,000 withdrawal in December, 2009 from the Joint Account.

### V. Claims

As of the date of this Report a total of seventy eight Proofs of Claims have been filed in this case.  All but two appear to have been filed prior to the June 10, 2010 bar date set by this Court.  Of the claims listed on the Claims Register a total of thirty claims assert secured status against

one or more of the Debtor's real properties.[11] Two are priority tax claims, four are priority wage

claims and thirty seven are general unsecured claims. The Examiner has done a cursory review

of the Proofs of Claims and discussed many of them with the Debtor.

## A. Priority Tax Claims

Claim No. 4 is a priority tax claim filed by the Internal Revenue Service in the amount of

$176,662.50 which represents income taxes allegedly due from the Debtor for the years 2007 and

2008, the years for which the Debtor had not filed tax returns. After discussing the Internal

Revenue Service Proof of Claim with the Debtor and with the Debtor's accountants at Verdolino

& Lowey, the Examiner understands that Verdolino & Lowey recently prepared, and the Debtor

executed and forwarded to the Internal Revenue Service, tax returns for 2007 and 2008 which

indicate that there are no taxes due for these years. Assuming that the Internal Revenue Service

does not audit these returns it would appear that Claim No. 4 will eventually be withdrawn.

As for calendar 2009, Verdolino & Lowey has indicated that they are in the process of

preparing those tax returns and feel that it is likely that when those returns are completed they

will indicate that no tax is due.

On January 27, 2010, the Massachusetts Department of Revenue filed a Proof of Claim

which has been designated as Claim No. 19 on the Claims Register in the total amount of

$238,650.43, the majority of which is asserted as a priority claim. These taxes are made up of

2007 and 2008 income taxes and sales taxes due from the Piano Man for which the Debtor is

deemed a responsible person. On August 12, 2010, after having received income tax returns for

the years 2007 and 2008 that were prepared by Verdolino & Lowey, the Massachusetts

Department of Revenue filed an amended proof of claim which eliminated the income tax

---

[11] This includes Claim No. 40 filed by New England Phoenix Co., Inc., successor to Sovereign Bank in the amount of $130,355.00 which is secured by a real estate attachment on all of the Debtor's real estate in Middlesex County. The Examiner also notes that Sovereign Bank filed a UCCI statement against the Debtor (the only UCCI on record against the Debtor) in which it asserts a security interest against the Debtor.

portion of the claim but continued to assert a claim in the amount of $29,680.43 for unpaid Piano

Man sales taxes during 2007 and 2008[12]Verdolino & Lowey has indicated that they are in the

process of preparing the Piano Man's 2009 income taxes and that they feel that it is likely that

there will be little or no tax due for that year.

### B.  Non Tax Priority Claims

A total of four non tax priority claims were filed for unpaid wages which total $49,673.83.

### C.  General Unsecured Claims

Amended Schedule F to the Debtor's bankruptcy petition lists a total of one hundred

fourteen creditors.  The Debtor indicated that of these creditors he disputed the claims of ninety

of these creditors and he scheduled the amount due fifty-nine of the creditors as "unknown".

A total of thirty-seven general unsecured claims have been filed in this case in the total

amount of $549,618.27.  The Debtor has indicated that he will likely object to many of these

claims.  Although, it is certainly likely that the final amount of allowed unsecured claims will be

significantly less than the $549,618.27 filed, at this point the Examiner has not expended the

considerable amount of time necessary to make an educated guess as to what that amount

ultimately will be.

### VI.  Post Petition Operation of Real Estate Business

The Debtor's business involves the running of a total of twenty nine rental properties

including single-family houses, residential condominiums, two-family houses, four-family

houses and three commercial buildings.  The Debtor's real estate business, as well as the Piano

Man business, is run from offices located in the Debtor's building at 721 Main Street, Waltham,

Massachusetts.

---

[12] Verdolino & Lowey have indicated they are not preparing the Piano Man's sale tax returns.  The $29,680.43 claim is asserted as a priority claim in the amount of $23,177.03 and general unsecured claim in the amount of $6,503.40.

2049704v1

The Debtor's business is run through his debtor-in-possession account at Citizens Bank. With the exception of rents and expenses in connection with the Edgewater Park property, the Debtor and Ms. Pirozzi indicate that all rent checks and all expenses are paid through this account. The Debtor is current with his monthly operating reports which are being prepared by his accountants at Verdolino & Lowey. According to the most recent monthly operating report for the month of June, the Debtor has $85,058.00.

Currently there are three people who provide significant assistance to the Debtor in running his business: Crystal Pirozzi, Christopher Lewis and Tony Chisari.

### A.  Employees/Independent Contractors

### i.  Crystal Pirozzi

On August 9, 2010, the Examiner interviewed Crystal Pirozzi at the business premises. Ms. Pirozzi indicated that although her primary job was assisting the Debtor in connection with the running of his real estate business, she also helped out with the Piano Man business. She has worked for the Debtor since approximately 2007. Her duties include collecting and depositing rent checks, paying bills and handling the various issues that are brought to her attention concerning the properties. The Debtor pays her $12.00 an hour and she indicated that for the most part she works full-time. The Examiner's impression of Ms.Pirozzi is that although she seems to be a bit overwhelmed by the amount of work required of her, she is a very capable person and she seems to be generally on top of the business operation (See however discussion of security deposit issues in Section VI(B) of this Report).

2049704v1

### ii. Tony Chisari

Tony Chisari is a contractor/handyman. The Debtor indicated that Mr. Chisari is an independent contractor although the Debtor believes that Mr. Chisari works primarily on the Debtor's properties. According to Ms. Pirozzi all of the tenants are given Mr. Chisari's name and telephone number so that they can call him directly if any problems arise so that Mr. Chisari and the tenant can coordinate a time for any repairs to be done. On a weekly basis Mr. Chisari provides the Debtor with an invoice for services provided. Ms. Pirozzi indicated that while tenants are asked to call Mr. Chisari first, often times tenants who have issues still will call the Debtor's office directly. Mr. Chisari has worked for the Debtor for approximately one year.

### iii. Christopher Lewis

Mr. Lewis has been assisting the Debtor for the last several months with various aspects of the real estate business as well as helping him in connection with the bankruptcy case. The Examiner met with Mr. Lewis on August 9, 2010. The Examiner's impression of Mr. Lewis was that he seemed to have a handle on many aspects on the Debtor's business and appeared to be helpful to the Debtor. Mr. Lewis indicated to the Examiner that the Debtor had yet to pay him any compensation. The Debtor later advised the Examiner that he was paying for Mr. Lewis' hotel room at a rate of approximately $50.00 a night and providing Mr. Lewis with spending money, a car and storage space for Mr. Lewis personal property at 91 Felton Street.

An internet search concerning Mr. Lewis indicates that Mr. Lewis "pleaded nolo contendere in 1987 to various charges relating to a scheme to defraud investors. He was sentenced to a term of imprisonment of from nine to ten years, with the sentence suspended during a ten-year probationary period. In 1985, he was convicted of larceny in connection with a similar scheme. In 1997, a Superior Court judge found [Mr. Lewis] had violated his probation and sentenced him to serve the original term". See Christopher Barden Lewis v. Commonwealth of Massachusetts,

429 Mass. 1007 (1999).  In connection with the 1985 conviction, Mr. Lewis was "sentenced to

serve a term at the Massachusetts Correctional Institutional at Cedar Junction of not less than

four and one-half years nor more than five years".  See Commonwealth v. Lewis, 48 Mass App

Ct. 343 (1999).

### B.  Security Deposits

When asked whether any of the Debtor's tenants had delivered to him security deposits at

the time of the commencement of their tenancy, Ms. Pirozzi indicated that she was not sure but

that "there might be two or three".  She indicated that there was a "security deposit account" but

that no security deposits were in it.  Both she and the Debtor separately indicated that they would

not tend to take security deposits because of the several requirements under Massachusetts law

that are imposed on a landlord.  The Debtor indicated that he did not think that any of his tenants

had delivered security deposits but he was not 100% sure.  When the Examiner asked the Debtor

about the allegation made by Joanne DeProfio in her adversary proceeding (Adversary

Proceeding No. 10-01077) and Joyce Cicero in her adversary proceeding (Adversary Proceeding

No. 10-01078), that they had delivered a security deposit to the Debtor, the Debtor indicated that

they had delivered last month's rent checks at the beginning of their tenancy not security

deposits.

Massachusetts General Laws c. 186 Section 3 has many requirements concerning the

holding and return of security deposits given by residential tenants.  The Debtor appears to have

failed to comply with this statute in the past and may be doing so now.

## C. Habitability

There have been many habitability problems at the Debtor's residential properties.[13] These

include backed-up septic systems, failed heating units, lack of heating oil, leaking roofs, leaking

sinks, broken toilets and failed inspections by town Housing Authorities. Many of these issues

are the subject of three of the adversary proceedings filed by former tenants of the Debtor (See

*Joyce Cicero v. Robert Lupo*, Adversary Proceeding No. 10-01078 (allegations of broken toilet,

inadequate stove, leaking sink, broken door and lack of hot water, in addition to the issues with

failure by the Debtor to timely repair or cure the problems), *Joanne De Profio v. Robert N. Lupo*,

Adversary Proceeding No. 10-01077 (allegations of inoperable oven and smoke detector) and

*Myesha Vanover v. Robert N. Lupo* Adversary Proceeding No. 10-01075 (allegations of

termination of electrical service, failure to provide oil, septic system backup in the cellar)).

On August 9, 2010, the Examiner inspected the interiors of several of the Debtor's

residential buildings which were selected by the Examiner. The Examiner also inspected the

exteriors of several other residential buildings. During these site visits, and subsequent to the

visits, the Examiner spoke privately with several of the Debtor's tenants. Based on these

inspections and tenant interviews the Examiner feels that while the condition of some of the

buildings could certainly be better, at present there are few issues concerning habitability in the

Debtor's residential buildings[14]. The Examiner did note the presence of a blue tarp on a portion

of the roof of the house located at 700 Boston Post Road which the Debtor indicates has

prevented the continuing leak in that single-family house and the presence of damp ceilings at

---

[13] In addition to the issues at the Debtor's residential properties, at least one commercial tenant has complained about post-petition neglect by the Debtor (Attached hereto as Exhibit D is a letter dated January 5, 2010 from an attorney for Keltran Corporation to the Debtor).

[14] The Examiner is not an expert concerning the State Building Code or the State Sanitary Code. His conclusions are based only on what he saw and on his interviews with a few of the Debtor's tenants

28

the house located at 213 Boston Post Road, Wayland which the tenant indicated has a roof which leaks occasionally in heavy rainstorms.

The Examiner has also contacted the Housing Authorities which oversee rentals in several of the Debtor's residential properties.  A representative of the Waltham Housing Authority which supervises a significant number of the Debtor's Section 8 tenants advised the Examiner that while there had been problems in the past he was unaware of any issues or problems over the last six months. He did indicate that the Debtor's ability to rent to new Section 8 tenants had been suspended eighteen months ago, however, it was reinstated after a year and there have been no issues since then.  The Boston Housing Authority told the Examiner that the Debtor's real estate at 32A Dartmouth Street in Waltham failed its annual inspection and that the Debtor has until September 1, 2010 to remedy the issues.  The Housing Authorities in the Towns of Arlington and Newton have advised the Examiner that they have not had any issues with the Section 8 tenancies which they supervised for many months.

### D.  Loans to Piano Man

The Examiner notes that the Debtor's Monthly Operating Reports indicate that during the first seven months of this case the Debtor has made the following post petition loans to Piano Man totaling $2,030.

| Date | Loan Amount |
| --- | --- |
| April 13, 2010 | $750.00 |
| May 7, 2010 | $200.00 |
| May 11, 2010 | $500.00 |
| May 20, 2010 | $580.00 |

2049704v1

## E.  Stop Work Order - 45 South Street, Waltham

During the Examiner's investigation he became aware of the fact that a stop work order had

been posted on the Debtor's two-family house located at 45 South Street, Waltham,

Massachusetts.  The Examiner conducted an interior inspection of this house and discussed the

matter with the Debtor and building inspector for the Town of Waltham.  Based on this

investigation, the Examiner learned that the Debtor had Mr. Chisari conduct substantial

demolition work on the second floor of the South Street building in preparation for combining

the second floor and the attic into one unit.  Apparently Mr. Chisari had informed the building

inspector that the work was planned but he had never obtained a permit to do the work.  When

the building inspector noticed the work was ongoing he posted the stop work order.  After the

stop work order was posted, Mr. Chisari or another contractor on behalf of the Debtor, attempted

to get the proper permit on several occasions but each time was denied for failure to provide a

completed application.  On August 9, 2010, the date of the Examiner's inspection of the South

Street property, the Debtor advised the Examiner that a proper permit was about to be issued and

on August 13, 2010, the Examiner was provided with a copy of the permit that had been issued

that day.

**Both the Debtor and Mr. Chisari should have known that a permit from the Waltham**

**Building Inspector would be required to conduct the extensive demolition work undertaken**

**by Mr. Chisari.  There is no reason that such a permit could not have been obtained prior**

**to the commencement of work as opposed to several weeks after the building inspector**

**discovered the ongoing work.**

## F.  Sale of Motor Vehicle

One of the motor vehicles which was not included in the Original Schedules but was later

included in the Debtor's Amended Schedule B was a 1998 Ford Crown Victoria.  When

2049704v1

questioned about this vehicle the Debtor admitted that the vehicle had always been titled in his

name but said that he did not include the vehicle in his Original Schedules because his mother

had given him the money to buy it for her.  The Debtor's mother died in 2007.  When asked

about the status of the vehicle the Debtor advised the Examiner that at his wife's request he had

sold the vehicle to a friend of his wife's subsequent to the Petition Date without court approval.

The Debtor could not remember the exact amount of money he received for the sale of this

vehicle and when asked whether he received what he considered fair market value he said "I

received whatever they offered".[15]

The Debtor indicated that he had not told his then counsel, Hanify & King, about the sale of

this vehicle.

### G.  Payment to Gillis & Bikofsky

On March 16, 2010, this Court entered an Order allowing the <u>Application by Debtor and</u>

<u>Debtor-In-Possession to Retain Michael Gillis and Gillis & Bikofsky P.C. as Special Counsel</u> to

deal with eviction matters (Document No. 71).  Paragraph 11 of the Application to Employ is the

only place the manner of payment is discussed.  It states:

> 11. All compensation and expense reimbursement shall remain
> subject to allowance by this Court upon appropriate application
> pursuant to Section 330 and 331 of the Bankruptcy Code and any
> other compensation procedures established by this Court.

The Examiner notes that in the Schedule of Disbursements section of the Debtor's May,

2010 Monthly Operating Report there is an item that indicates the Debtor paid Gillis & Bikofsky,

P.C. the amount of $1,500.  No court approval for this payment was ever sought.

### H.  Wage Compliance

Ms. Jacobs had indicated in pleadings and to the Examiner that several wage complaints had

---

[15] The day after the Debtor made this statement to the Examiner, Attorney Ruttenberg advised the Examiner that the
Debtor thought he sold the vehicle for either $2,600 or $2,800.

been filed against the Debtor with the Massachusetts Attorney General's office. The Examiner has been advised by the Attorney General's Office that a total of seven complaints were filed against the Debtor in his capacity as the owner of Piano Man and that restitution was ordered for several of the claimants. The Examiner was also advised that all of these files were closed as of April 5, 2010 as a result of the bankruptcy filing.

## I. Insurance

At a recent hearing there was an issue raised as to whether the Debtor was current on his insurance. The Examiner understands that the Debtor is in fact current on insurance for all of his real estate and all of his vehicles

## VII.

## Conclusion

Although many parties have asked the Examiner to make a recommendation concerning the future of this case, such a step seems to be beyond the dictates of § 1106(a)(4) of the Bankruptcy Code. Rather the Examiner merely presents the results of his investigation in this Report in the hope that it will be of some benefit to the Court and the parties in interest in this case.


Respectfully submitted,


_____/s/ Mark G. DeGiacomo_____
Mark G. DeGiacomo, Esq. BBO #118170
Murtha Cullina LLP
99 High Street
Boston, MA  02110
617-457-4000 Telephone
Dated:  August 16, 2010                617-482-3868 Facsimile

2049704v1

**EXHIBIT A**

| Address | City | Owner | Property Description | Total # of Units | # of Rented Units | Estimated Monthly Rents | Estimated Monthly Expenses | Net Income Before Debt Service | Lender | Debt Service per Loan Docs | Purchase Date | Estimated Tax Basis | Estimated Value per R. Lupo | Zillow Estimated Value | 2010 Assessed Value | Outstanding Mortgage @ 12/31/09 - Per Schedules | Outstanding Mortgage @ 12/31/09 - Per Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 45 South | Waltham, MA | Robert Lupo | 2 family - fully occupied | 2 | 2 | 3,350 | 2,057 | 1,293 | Riceland Trust as Collateral for 22 Felton | | 10/27/1976 | 0 | 450,000 | 460,000 | 421,100 | | 652,646 |
| 22 Felton | Waltham, MA | Robert Lupo (trust revised on | Building (storage facility for The | 2 | 1 | 1,500 | 2,044 | (544) | Riceland Trust | 5,161 | 7/15/2002 | 538,753 | 900,000 | | 705,500 | 542,000 | 652,646 |
| 91 Felton | Waltham, MA | Robert Lupo (trust revised on | Building (one vacant and | 3 | 1 | 4,886 | 4,007 | 879 | Riceland Trust | 5,939 | 12/15/2001 | 597,106 | 825,000 | 433,200 | 649,000 | | 780,396 |
| 716-723 Main | Waltham, MA | Robert Lupo (trust revised on | Building (fully unoccupied | 10 | 4 | 7,911 | 4,359 | 3,552 | Riceland Trust for 81 Felton | 4,228 | 2/4/1982 | 247,288 | 1,050,000 | 944,900 | | 398,000 | 459,509 |
| 10-32 Dartmouth | Waltham, MA | Robert Lupo | 2 family - fully occupied | 2 | 2 | 3,524 | 1,045 | 2,479 | Riceland Trust as Collateral for 81 Felton | 2,479 | 2/2/1976 | 21,749 | 425,000 | 487,500 | 421,650 | | |
| 126 Florence | Waltham, MA | Robert Lupo | Single family - occupied | 1 | 1 | 2,105 | 750 | 1,355 | Bank of America - was Countrywide | 1,946 | 6/1/1983 | 1,218 | 550,000 | 440,000 | 377,800 | 283,000 not yet filed | 288,503 |
| 21 Davis, C11 | Acton, MA | Robert Lupo | Condo - occupied | 1 | 1 | 1,025 | 561 | 464 | Countrywide | 594 | 6/1/1988 | 20,672 | 150,000 | 135,000 | 141,800 | 51,000 not yet filed | |
| 17 Davis, A15 | Acton, MA | Robert Lupo | Condo - occupied | 1 | 1 | 1,200 | 507 | 693 | Bank of America | 621 | 6/1/1988 | 21,625 | 150,000 | 151,000 | 157,100 | 53,000 not yet filed | |
| 19 Davis, C16 | Acton, MA | Robert Lupo | Condo - occupied | 1 | 1 | 671 | 671 | 0 | Bank of America | 648 | 6/1/1988 | 22,543 | 150,000 | 135,000 | 162,200 | 55,000 not yet filed | |
| 17 Davis, B8 | Acton, MA | Robert Lupo | Condo - occupied | 1 | 1 | 1,100 | 600 | 500 | Bank of America | 573 | 6/1/1988 | 19,922 | 150,000 | 135,000 | 135,000 | 55,000 not yet filed | |
| 17 Davis, C9 | Acton, MA | Robert Lupo | Condo - occupied | 1 | 1 | 1,100 | 600 | 500 | Bank of America | 573 | 6/1/1988 | 19,922 | 150,000 | 128,000 | 138,100 | 49,000 not yet filed | |
| 18-20 Vernon | Waltham, MA | Robert Lupo | 4 family - 3 occupied, 1 in renovation | 4 | 4 | 3,575 | 1,930 | 1,645 | Litton Loan Srvcg | 1,706 | 10/26/2004 | 246,826 | 500,000 | 500,000 | 406,900 | 292,000 | 288,503 |
| 60-62 Orange | Waltham, MA | Robert Lupo | 4 family - fully occupied | 4 | 4 | 4,880 | 2,448 | 2,432 | AHMSI | 3,086 | 10/25/2005 | 25,598 | 650,000 | 385,000 | 385,400 | 384,000 not yet filed | |
| 10-12 Nathan | Waltham, MA | Robert Lupo | 4 family - fully occupied | 4 | 4 | 4,768 | 2,703 | 2,065 | Bayview | 1,461 | 12/12/2005 | 64,262 | 650,000 | 462,000 | 462,500 | 244,000 | 276,401 |
| 91-93 Hammond | Waltham, MA | Robert Lupo | 2 family - fully occupied | 2 | 2 | 3,600 | 1,470 | 2,130 | Suntrust | 1,742 | 10/25/2004 | 260,776 | 800,000 | 634,000 | 506,400 | 293,844 | 293,844 |
| 164-166 Washington | Newton, MA | Robert Lupo | Single family (daughter's home) | 1 | 1 | 1,500 | 912 | 588 | Suntrust | 1,527 | 11/1/1984 | 41,344 | 750,000 | 560,000 | 548,500 | 231,314 | 231,314 |
| 221 Tower | Lincoln, MA | Robert Lupo & Jean Reynolds (TbyE) | Single family | 1 | 1 | 1,500 | 912 | 588 | RTN Fed Cred Union | 3,046 | 10/22/2005 | 644,343 | 1,000,000 | 577,500 | 641,300 | 554,000 | 585,990 |
| 9 Sky Harbor | Biddeford, ME | Robert Lupo & Jean Reynolds (TbyE) | Single family | 1 | 1 | 1,400 | 626 | 774 | Saco-Biddeford Savings | 2,478 | 6/15/2004 | 330,308 | 675,000 | 550,000 | 226,000 | 384,000 | 400,062 |
| 213 Boston Post | Wayland, MA | Robert Lupo | Single family | 1 | 1 | 1,259 | 1,259 | 1,991 | Chase - was Washington Mutual | 2,670 | 2/27/2004 | 620,159 | 700,000 | 640,000 | 581,400 | 545,000 | 687,959 |
| 26-30 School | Waltham, MA | Robert Lupo | 4 family - fully occupied | 4 | 4 | 5,627 | 1,838 | 3,789 | RTN Fed Cred Union | 2,913 | 10/25/2005 | 39,295 | 750,000 | 430,000 | 429,300 | 380,000 | 371,280 |
| 402 Parker | Newton, MA | Robert Lupo & Peter Collins | Single family | 1 | 1 | 1,675 | 1,031 | 645 | Unknown | 939 | 11/1/1984 | 2,234 | 350,000 | 382,500 | 330,000 | 109,000 not yet filed | 258,434 |
| **Income Property Totals/(Adj to R/N/L %)** | | | | | | 67,289 | 33,046 | 29,243 | | 41,980 | | 3,784,627 | 11,800,000 | 7,814,788 | 6,389,280 | 6,679,269 | 9,167,086 |
| **Revocable Trusts** | | | | | | | | | | | | | | | | | |
| 131 Tower | Lincoln, MA | Tower Realty Trust | occupied | 1 | 1 | 2,000 | 749 | 2,151 | Countrywide | 3,243 | 10/15/2003 | 115,544 | 1,000,000 | 538,000 | 564,000 | 472,000 not yet filed | |
| 25 Melville Avenue | Newton, MA | 25 Melville Avenue Family Trust | Single family - occupied | 1 | 1 | 1,725 | 570 | 1,155 | ASC | 1,404 | 10/1/2004 | 86,792 | 550,000 | 366,500 | 367,600 | 220,000 not yet filed | |
| 238 Linwood | Newtonville, MA | Linwood Realty Trust | Single family - occupied | 1 | 1 | 2,375 | 687 | 1,688 | ASC | 908 | 3/12/2000 | 125,653 | 550,000 | 401,500 | 361,900 | 142,000 | 139,995 |
| 700 Boston Post | Weston, MA | RN Lupo Family Trust | Single family - occupied | 1 | 1 | 2,100 | 745 | 1,355 | ASC | 1,683 | 11/11/2004 | 36,635 | 700,000 | 533,500 | 489,600 | 283,000 | 258,434 |
| **Key Trust Income Property Totals** | | | | 4 | | 9,100 | 2,751 | 6,349 | | 7,238 | | 364,624 | 2,830,000 | 1,839,600 | 1,783,100 | 1,097,000 | 398,529 |
| **Spendthrift Trusts** | | | | | | | | | | | | | | | | | |
| 10 Edgewater | Newton, MA | Lupo Edgewater Realty Trust | | 1 | 1 | 1,600 | 696 | 904 | None | 0 | 3/17/2007 | 186,166 | 500,000 | 395,500 | 359,100 | 712,000 | 0 |
| 97 Hamilton | Waltham, MA | N&A Realty Trust | | 1 | 1 | 2,300 | 653 | 1,647 | None | 0 | 3/17/2007 | 166,219 | | 367,000 | 368,500 | | 0 |
| 28-33 Hobreiden | Mashpee, MA | Lupo Mashpee Realty Trust | | 0 | 0 | | 263 | (263) | none | 0 | 3/17/2007 | | 424,000 | 424,000 | 424,000 | | 0 |
| 29 Mayne Standish | Weston, MA | N&A Realty Trust | | 1 | 1 | 3,250 | 2,485 | 765 | None | 0 | | 824,448 | 924,000 | 999,000 | 1,054,900 | 1,054,900 | 0 |
| **Totals** | | | | | | 7,150 | 4,097 | 3,853 | | 0 | | 1,176,834 | | 2,185,600 | 2,206,500 | 1,282,800 | 0 |
| **Trust Held Income Property Totals(Adj to R/N/L %)** | | | | | | 4,376 | 2,397 | 1,978 | | | | 641,960 | | 1,290,900 | 1,282,800 | | 0 |
| **Total Income Property (Adjusted to R/N/L % Holdings)** | | | | | | 73,764 | 38,194 | 37,570 | | 48,619 | | 4,830,950 | 16,382,000 | 10,144,780 | 11,465,100 | 6,575,659 | 5,555,515 |

| Address | City | Owner | Property Description | Total # of Units | # of Rented Units | Estimated Monthly Rents | Estimated Monthly Expenses | Net Income Before Debt Service | Lender | Debt Service per Loan Docs | Purchase Date | Estimated Tax Basis | Estimated Value per R. Lupo | Zillow Estimated Value | 2010 Assessed Value | Outstanding Mortgage @ 12/10/09 - Per Schedules | Outstanding Mortgage @ 12/10/09 - Per Claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 89 Sudbury | Weston, MA | Robert Lupo & Jean Reynolds (TbyE) | Personal Residence | | | 0 | 2,304 | (2,304) | RTN Fed Cred Union | 2,608 | | 620,000 | 1,700,000 | 1,636,000 | 1,800,900 | 461,500 | 567,976 |
| Winalkee Extension | Moultonboro, NH | | Single family vacation home | | | 0 | 384 | (384) | Meredith Village Savings | 446 | 9/4/1992 | 25,787 | 650,000 | 536,400 | 561,100 | 38,000 | 36,881 |
| | | | | | | 0 | 2,688 | (2,688) | | 3,055 | | 645,787 | 2,350,000 | 2,172,400 | 2,362,000 | 499,500 | 604,857 |
| Overall Total (RNL Holdings & Personal Residence @100%) | | | | | | 75,764 | 40,882 | 34,882 | | 51,673 | | 6,476,737 | 17,712,000 | 12,317,190 | 13,827,100 | 7,076,189 | 6,160,371 |

Page 2 of 2

**EXHIBIT B**

## Vehicles owned by Robert Lupo[1]

| Vehicle | Sch. Value | KBB Trade-In | KBB Private Value | NADA Avg. | Purchase Price (NH) |
|---|---|---|---|---|---|
| 1997 Toyota 4Runner | $1,475.00 (o) | $3,575.00 | $5,215.00 | - | - |
| 2003 Cadillac Deville | $5,200.00 (o) | $7,650.00 | $9,670.00 | - | - |
| 1991 Camaro | $400.00 (o) | $1,550.00 | $2,335.00 | - | - |
| 1981 BMW 733 | $1,375.00 (o) | - | - | $4,400.00 | $15,000.00 |
| 2003 Toyota Celica[2] | $4,275.00 (o) | $8,000.00 | $9,925.00 | - | - |
| 2003 Toyota MR2 | $6,300.00 (o) | $8,525.00 | $10,500.00 | - | - |
| 1976 Triumph TRG | $6,000.00 (o) | - | - | $12,400.00 | - |
| 1985 Oldsmobile Delta88 | $300.00 (o) | - | - | $3,325.00 | - |
| 1984 Datsun 300z | Unknown (a) | - | - | $4,725.00 | $8,425.00 |
| 1982 BMW 628CSi | Unknown (a) | - | - | $6,200.00 | $16,641.00 |
| 1932 Chevy | Unknown (a) | - | - | $23,000.00 | not avail. |
| 1965 Ford Mustang | Unknown (a) | - | - | $30,625.00 | $13,994.00 |
| 1964 Studebaker | Unknown (a) | - | - | $7,450.00 | $5,660.00 |
| 1986 Vixen 21 MH | Unknown (a) | - | - | $2,261.00 | $11,269.00 |
| 1998 Crown Vic | $1,800 (a) | $2,425.00 | $3,625.00 | - | - |

## Vehicles owned by Piano Man

| Vehicle | KBB Trade-In |
|---|---|
| 2002 Chevy Silverado | $5,575.00 |
| 1999 Ford F350 | $4,650.00 |
| 1999 GMC Safari | $1,750.00 |
| 1993 Saturn SW2 | $850.00 |

---

[1] Kelly Blue Book ("KBB") was used by the Examiner to calculate the values for the Debtor's vehicles that were manufactured prior to 1991, as KBB does not calculate values of vehicles manufactured prior to 1991. The NADA Guides were used to value all other vehicles. In valuing the vehicles, the Examiner used an estimated mileage of 100,000 miles. For KBB, the Examiner chose the "Good" value to indicate the condition of the vehicle. For NADA, the Examiner used the "Average Retail" value to reflect the condition/value of the vehicle.

[2] The Toyota MR2 is secured by RTN Federal Credit Union by an automobile loan in the amount of $5,972.09 as indicated by Claim No. 31 on the Claims Register.

**EXHIBIT C**

# THE PIANO MAN, INC.
## Vintage and New Pianos

6/13/02

I assign any and all interests
in following vehicles : to The Piano Man
Inc. 719 Main St. Waltham
Ma. For Pianos/Ads/Front of Store
Events

1    1965 Mustang Conv.
Maroon

2    1964 Studebaker Daytona
Green

3    1982 BMW CSI Conv.

4    1984 300 ZK Nissan
-Datson Callaway

5    Viexen Motor Home =

**EXHIBIT D**

# KERSTEIN, COREN & LICHTENSTEIN LLP
### *Attorneys at Law*

60 Walnut Street
Wellesley, MA 02481

ROBERT ROSENBLUM, Esq.
*Of Counsel*

TEL:    (781) 997-1600
FAX:    (781) 997-1633
rrosenblum@kcl-law.com

SENT VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

January 5, 2010

Robert N. Lupo
721 Main Street
Waltham, MA 02451

Re:    *Lease between Keltron Corporation and Felton Street Realty Trust*
       *Demised Premises: 91 Felton Street, Waltham, Massachusetts*

Dear Mr. Lupo:

I represent Keltron Corporation ("Keltron"). As you know, my client has been trying to contact you for the past two weeks regarding your failure to maintain the premises at 91 Felton Street. During the past two weeks you have breached the lease with Keltron in at least the following instances:

1. Your failure to have the snow plowed required Keltron to hire a snow plow service on December 21, 2009 and again on January 3, 2010 at a cost to Keltron of $200.00.

2. Last week you failed to have oil delivered. Keltron called you about this several times but you never returned their calls and Keltron was, therefore, required to fill the tank with approximately 875 gallons of oil and to have the heating system reset because it had rundown to zero. The cost to Keltron for the oil and the reset was $2,447.72.

3. At some point over last weekend, your failure to keep the heat on caused the pipes to burst. This resulted in flooding which has come into Keltron's premises.

4. After the pipes burst the water in the building was shut down on Monday January 4, 2010. Since that time Keltron has not had water and, therefore, has been unable to use the bathroom facilities and has had to bring water into the premises in order to perform Keltron's normal business activities.

By this letter Keltron demands that you meet your obligations as landlord of the

Case 09-21945   Doc 344   Filed 08/16/10   Entered 08/16/10 16:28:39   Desc Main
Document     Page 42 of 42

Case 09-21945   Doc 113-1   Filed 03/29/10   Entered 03/29/10 14:10:05   Desc Letter
from Tenant Lawyer re Bursting Pipes   Page 2 of 2

premises.    Further, your breach of the lease necessitates that we off-set from our rent the costs
we have incurred for carrying out your responsibilities.

Please let us know what you intend to do regarding the above issues and costs.

Sincerely,

Robert Rosenblum, Esq.

Cc:    David Wilbourn
       Andy Lizotte, Esq.
       Eric Bradford, Esq.
       Thomas E. Pontes, Esq.