# UNITED STATES BANKRUPTCY COURT
## FOR THE
### DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**ROBERT N. LUPO**,                          Chapter 7
       Debtor                          Case No. 09-21945-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

Two matters are before the Court:  1) the Chapter 7 Trustee's "Objection to Chapter 11 Administrative Claim (Docket #643) and to Administrative Proof of Claim (Claim No. 1-2) filed by Lisa Jacobs" ("Ms. Jacobs"); and 2) the Chapter 7 Trustee's Objection to the Proof of Claim filed by Ms. Jacobs.  Ms. Jacobs, acting pro se, filed responses to the Trustees's Objections.  The Court conducted an evidentiary hearing on April 17, 2012 with respect to the contested matters at which Ms. Jacobs was represented by counsel.  At the hearing, three witnesses testified, including Ms. Jacobs and Robert N. Lupo (the "Debtor"), and 25 exhibits were introduced into evidence. The Court now makes its findings of fact and conclusions of law.[1]

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and (b) and the order of reference issued by the United States District Court for the District of Massachusetts. This contested matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (B).

## II. FACTS

On December 10, 2009, the Debtor filed a voluntary Chapter 11 petition.  On August 19, 2010, Joseph B. Collins (the "Trustee") the Trustee was appointed Chapter 11 Trustee of the Debtor's bankruptcy estate. Approximately one month later, on September 15, 2010, the Court entered an order converting the Debtor's Chapter 11 bankruptcy case to a case under Chapter 7, effective September 18, 2010.  The Trustee accepted appointment as Chapter 7 Trustee of the Debtor's bankruptcy estate and continues to serve in that capacity.

On January 12, 2010, the Debtor filed Schedules of Assets and Liabilities and a Statement of Financial Affairs.  On Schedule A-Real Property, the Debtor listed ownership interests in 23 properties, all of which he claimed to own in fee simple, except for his residence and a property located at 402 Parker Street in Newton, Massachusetts. On Schedule B-Personal Property, the Debtor also listed interests in trust entities, some of which held title to real properties.[2]  On Schedule F-Creditors Holding Unsecured Nonpriority Claims, the Debtor listed Ms. Jacobs as the holder of an unliquidated, disputed claim in an unknown amount.  On Schedule G-Executory Contracts and Unexpired Leases, the Debtor listed 40 leases of real property. In his Statement of Financial Affairs, he disclosed an interest in a

---

[2] The Court takes judicial notice that prior to the conversion of the Debtor's Chapter 11 case to a case under Chapter 7, the court appointed an examiner.  *See* <u>Mailman Steam Carpet Cleaning Corp.</u>, 196 F.3d 1, 8 (1st Cir. 1999).  On October 7, 2010, the examiner, Mark G. DeGiacomo, Esq., filed a report disclosing that the Debtor owned, either directly or indirectly, 32 properties, all but seven of which were properties he rented to residential tenants.  The examiner found that of the 40 occupied housing units owned by the Debtor 23 were occupied by so-called "Section 8" tenants under the supervision of various housing authorities.

business identified as Lupo & Associates.  He noted that "Corporate status not presently recognized because of delays in filing annual reports."

On March 15, 2010, the Debtor filed a Notice of Amendment to his Schedules of Assets and Liabilities and Statement of Financial Affairs.  He did not amend Schedule F to alter his designation of Ms. Jacobs's prepetition claim as unliquidated and disputed, and he did not amend Schedule G.  Additionally, he did not disclose any additional information about Lupo & Associates in his amended Statement of Financial Affairs.   He amended Schedule B, however, to add an additional trust and to describe the property held in trust.  The Debtor did not list Ms. Jacobs on his Schedule of Postpetition Creditors which he filed on  October 7, 2010.

On December 19, 2009, before the Debtor filed his Schedules and Statement of Financial Affairs, Ms. Jacobs was served with a "Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines," which informed her of the commencement of the Debtor's case.  On December 16, 2009, Ms. Jacobs filed a proof of claim with the Bankruptcy Court asserting an amount due from the Debtor of $74,191.60 (Claim No. 1-1) before service of the Notice.[3]  In an attachment to the proof of claim, she stated that she was able to obtain a one-year lease extension from Marilyn Tulles, whose rent was $1,725 per month, for which she sought a 10% commission in the amount of $2,242.50.  Additionally, she stated that she

---

[3] The Trustee did not object to, or move to strike, the documents attached by Ms. Jacobs to her proof of claim, to her amended proofs of claim,  or to her request for reimbursement of administrative expenses (#643 and #945).

obtained a lease extension from Deborah Eisen, whose rent was $1,220 per month, for which she sought a 10% commission of $1,464.  Ms. Jacobs did not provide an address for either Ms. Tulles or Ms. Eisen.  The Debtor listed the Tullis [sic] lease on Schedule G for property located at 32A Dartmouth St.; he did not list a lease for Ms. Eisen.

Through her proof of claim, Ms. Jacobs also sought reimbursement of salary for activities as a property manager in the amount of $25,585.  Ms. Jacobs calculated her compensation based upon a 43-hour work week at the rate of $35 per hour for 17 weeks.  She also sought reimbursement of expenses in the amount of $3,069.

On November 4, 2010, the Trustee filed an Objection to Jacobs's Prepetition Claim (Docket No. 663). About one month later, on December 10, 2010, Ms. Jacobs filed two amendments to her Prepetition Claim. The two amendments bifurcated the prepetition claim into separate categories for services and expenses.  Ms. Jacobs attached her affidavit to her amended claim for $71,122.60 for services, and she attached the affidavit of Mike Robert, the owner of Sherman Lock, Inc. in support of her claim of $3,069 for expenses.

In her affidavit, Ms. Jacobs stated in pertinent part that she was the "Broker's salesperson" for the Debtor, adding "Bowditch & Dewey recognized my services fees [sic] as undisputed & advised Robert Lupo of his need to pay me & his violations of MA wage & labor laws in not doing so."  In addition, she stated "Mike Gillis, Esq. and Al Gray Esq., & etc. attorneys watched me as an employee who was a female go unpaid while Lupo paid male realtors."  She also stated that she retained Attorney Leslie Greer because the Debtor failed to complete "standard paperwork & pay me." Ms. Jacobs intimated that the Debtor refused

4

to certify her as a salesperson, a precursor to obtaining a broker's license.

In his affidavit, dated December 9, 2010, Mike Robert stated that "On or about August 20, 2009, Sherman Lock Inc. "received notice that Lisa Jacobs was the property manager, business manager and MA licensed real estate salesperson employee of Robert Lupo and that she was authorized to make copies of the Robert Lupo and Robert Lupo, Trustee properties' keys."  He added that her authorization "included authorization to make copies of the Lupo residential master and the Lupo commercial master key."  He further stated:

> Lisa Jacobs often entered Sherman Lock Inc. to make copies of keys and also to purchase real estate combination lock boxes that go onto a property in order to allow for realtors to enter as in doing sales and or rental [sic].  The payment received was not via check of Robert Lupo or his business but via cash by her personally.
>
> My understanding is that Lisa Jacobs was Robert Lupo, Real Estate Broker and Owner real estate salesperson, property manager and business manager.

On October 29, 2010, Ms. Jacobs filed a document, captioned "Chapter 11 Administrative Claim" (Docket No. 643), and shortly thereafter, on November 5, 2010, she filed a proof of claim with the Court seeking payment for "employee administrative chapter 11 claim" (Claim No. 1-2).  On December 8, 2010, the Trustee filed an Objection to Ms. Jacobs's Administrative Claim (Docket No. 888).  Shortly thereafter, on December 13, 2010, Ms. Jacobs filed a document titled "Amendment to Administrative Claim of Lisa Jacobs" together with an affidavit and exhibits  (Docket No. 945), comprising over 700 pages.  In her affidavit in support of her administrative claim, Ms. Jacobs focused on the Debtor's discriminatory treatment of her due to her age and gender while she served as "his real estate

sales person, property manager and business manager." She stated that, although the Debtor

refused to pay her and that she had engaged Attorney Greer, "[o]n or about Dec. 11, 2009,

Lupo rehired me," adding that "Lupo explained to me that [the] real estate business was not

involved in the bankruptcy and that he and I were operational still as property manager,

business manager, and real estate salesperson." She also stated that the Debtor rehired her

on December 18, 2009 "as his salesperson, property manager and business manger not as

professional but as an employee."

In her December 13, 2010 affidavit, Ms. Jacobs stated the following with respect to her

entitlement to postpetition commissions:

> In support of this administrative claim, I attach my affidavit of Dec. 13, 2010
> which is my affidavit of December 13, 2010 [sic]. In tersm [sic] of an initial
> dollar amount, I cite: 1. Arthur Kelly 62 B Orange St. $1,599 dollar commission
> is owed; 2. 20 B Vernon St. rental commission is owed $1,500 dollar
> commission. 3. 91 B Hammond St. 4. third floor 719-721 Main St. 5. 22 Felton
> St. commercial garage 6. 91 B Felton St. etc. $3,099 plus more is due as well as
> interest on an $8,000 commission which is sitting in escrow which Lupo has
> refused to sign for while being in a broker fee dispute with other brokers which
> is my commission that has been over due to me for over a year.

In addition, Ms. Jacobs attached to her amended request for administrative expenses

the affidavit of Leslie Greer, dated December 9, 2010. Ms. Greer stated that she spoke with

an attorney at Bowditch & Dewey "who had been assigned the task of negotiating on the part

of the Debtor to resolve Jacobs's employment issues." Attorney Greer further stated that the

Debtor took the position that Ms. Jacobs was not being paid because of his cash flow

problems and "[a]t no time in the negotiations did the Debtor or his attorneys deny that

Jacobs worked for the Debtor as a property manager or real estate sales agent. The only thing

6

at issue in the negotiations was the basis upon which and amount that Jacobs was to be paid."

At the trial, Ms. Jacobs offered 19 exhibits into evidence, including 18 exhibits for properties listed in the Multiple Listing Service ("MLS").[4]  The exhibits are print outs from the MLS which contain descriptions of properties for sale or lease by "Lupo Associates Realty" for which Ms. Jacobs is identified as the "Listing Agent." Of the foregoing properties, only one exhibit, Exhibit 14, referenced a property for which Ms. Jacobs seeks a postpetition commission.  The MLS listing for 91 Felton St., Unit B, shows that the listing was temporarily withdrawn on December 18, 2009 and expired on November 2, 2010.

The following chart summarizes information available to the Court from Ms. Jacobs's proofs of claim, Ms. Jacobs's MLS exhibits, and the Debtor's Schedule G with respect to the commissions she seeks for leasing properties.

| Property Address | Tenant | Rental Date (POC) | MLS Listing Rental Amt. | Listing Date/Off Market Date from MLS | Proof of Claim or Exhibit | Sched. G | Commission claimed |
|---|---|---|---|---|---|---|---|
| 25 Mellville Ave. Unit 1[5] | Synthia Pereya (from Schedule G) | 11/15/09 | $2,200 | 9/12/09 11/21/09 | POC and Exhibit 1 | Yes | $2,070 |

---

[4] Three of the listings pertaining to 506 North Ave. Weston were for property the Debtor did not own and which are not property of the bankruptcy estate.

[5] Myesha Vanover commenced an adversary proceeding against the Debtor to which she attached a lease for this property for a term beginning on January 1, 2009 and ending on December 31, 2009.  In addition, she made allegations about Ms. Jacobs's misconduct as a "property manager" for the Debtor.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 12A Nathan Rd.[6] | William Fenzel | 12/1/09 | $1,195 | 9/26/09 11/21/09 | POC and Exhibit 2 | Yes | $1,761 |
| 12A Nathan Rd. | Ethel Bregali | 12/1/09 | $1,195 | 9/26/09 11/21/09 | POC and Exhibit 2 | No | $1,476 |
| 12B Nathan Rd. | James McCrae | 9/1/09 | $1,150 | 8/12/09 8/19/09 | Exhibit 2 (Weichert Realtors is the listing office) | Yes | $1,434 |
| 18 Vernon St. Unit B | Michael Schoolman | unknown | $1,320 reduced to $1,200 as of 11/12/09 | 10/15/09 10/15/10 withdrawn temporarily 12/18/09 | POC and Exhibit 3 | No | $1,320 |
| 45 B South St. | Ahmad Osmani | 8/30/09 | unknown | not on MLS | POC | Yes | $990[7] |
| 18A Vernon St. | Dixita Silwhl | 8/25/09 | unknown | 8/28/09 8/28/09 | POC and Exhibit 3 | No | $1,560 |
| 18A Vernon St. | Yessenia Guadelpe | unknown | unknown | not on MLS | POC | No | $1,560 |
| 26.5 School Ave. | Luz Ferrera | 12/1/09 | unknown | not on MLS | POC | Yes | $1,684 |
| 26.5 School Ave. | Lori-Anne Hammond | unknown | unknown | not on MLS | POC | No | $1,710 |
| 26½ School Ave. | Walkea Browning | unknown | unknown | not on MLS | POC | No | $1,696 |
| 45A South St. | Manual Garzone | 12/1/09 | unknown | not on MLS | POC | Yes | $1,800 |
| 45A South St. | Joanne DeProfio[8] | 11/1/09 | unknown | not on MLS | POC | No | $2,070 |
| 14 Felton St. | unknown | unknown | unknown | not on MLS | POC | No | $1,890 |
| 37 River St. | unknown | unknown | unknown | not on MLS | POC | No | $57.60 |

[6] Ms. Jacobs listed 12A Nathan Road twice in her proof of claim.  She is seeking a commission of $1,476 for a December 1, 2009 rental to Ethel Bregali, in addition to the $1,761 commission for the rental to William Fenzel.

[7] In an exhibit attached to her amendment to her request for administrative expenses, Ms. Jacobs referenced the lease of 45B South Street indicating that "[t]he commission from tenants to landlord agent is $825.00 and I am identified [as] landlord agent in the lease."

[8] Ms. DeProfio commenced an adversary proceeding against the Debtor pursuant to 11 U.S.C. § 523(a)(4)(A) and (a)(6), in which she alleged that she resided at 18B Vernon Street, Waltham, MA between December of 2007 and October 31, 2009.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 62A Orange St. | Arthur Kelley | 12/1/09 | unknown | not on MLS | POC | Yes (but no. 62B. | $1,476[9] |
| 37 River St. | unknown | unknown | unknown | not on MLS | POC | No | $57.60 |
| 1164 Main St. | Pete Tayverna | 11/28/09 | unknown | not on MLS | POC | No | $1,750 |
| 23 Church St. | Odilia and Angelo Dopazs | unknown | unknown | not on MLS | POC | No | $1,440 |
| 40 Grove Rd. | Sayed Fahim | 10/1/09 | unknown | not on MLS | POC | No | $1,500[10] |
| 91B Hammond St. | Eleanor Burns | unknown | unknown | not on MLS | POC | No | $1,848 |
| 1164 Main St. | Theresa Evaristo | unknown | unknown | not on MLS | POC | No | $4,710 |
| 193 Weston Rd. | unknown | unknown | unknown | not on MLS | POC | No | $1,740 |

Ms. Jacobs also sought commissions from the sales of properties. She listed one property on her proof of claim: 24 Earle St., Norwood, Massachusetts for which she sought a "buyer agent commission" of $7,995 for an August 26, 2009 closing. With respect to the MLS listing for the sale or lease of other properties, all were marked as "temporarily withdrawn" on December 18, 2009, except three rental properties: 25 Melville Ave. and 12A Nathan Road and 12B Nathan Road. Ms. Jacobs introduced no evidence that any of the properties were ever sold, let alone evidence of her involvement in the sale. The Court's Docket Report, submitted by the Trustee as an exhibit, reflects that each of the properties were sold or abandoned by the Trustee during the Chapter 7 portion of the Debtor's case.

---

[9] Ms. Jacobs, in her affidavit attached to her amendment to her Chapter 11 request for administrative expenses (#945), stated that Arthur Kelley's lease was consummated on Dec. 11, 2009." The Debtor listed Mr. Kelly's lease on Schedule G.

[10] Ms. Jacobs in her proof of claim dated December 16, 2009 stated "$1,500 commission is due from Syed  $1,500 from Syed Fahim and $3,000 from Synthia Peyrera for renting of 40 Grove Rd. Waltham for Oct. 1, 2009a" [sic].

9

Ms. Jacobs testified that she was an important part of the Debtor's business operations. She stated that she began working for the Debtor on August 12, 2009, adding that she served as "a property manager, real estate salesperson, business manager, informal guardian for Robert Lupo, The Piano Man, Lupo & Associates, Lupo Moving Company, and also the Robert Lupo Property Management Company." She testified that she "worked for those entities generally and the employees who did the real estate transactions were generally paid by The Piano Man, which was the music store." She also indicated that she was "a piano saleswoman, a hostess, a receptionist, a secretary, an officer organizer."

Ms. Jacobs explained that she met the Debtor when she was working as a real estate saleswoman at Weichert Realtors in Newton, Massachusetts, under broker James Lowenstern. She stated that she obtained many listing agreements and worked on behalf of the Debtor and various realty trusts in which he was involved. Specifically, she testified that she executed many different contracts with the Debtor on August 12, 2009, and that shortly thereafter she went to work for the Debtor and "Mr. Lowenstern and Mr. Lupo entered into an agreement where my listings transferred from Mr. Lowenstern's brokerage to Mr. Lupo's brokerage."

With respect to properties listed on the MLS, Ms. Jacobs testified that she listed properties for sale or rent. She indicated that she took pictures of and prepared the listing sheets for the properties but was careful to list Lupo Associates Realty as the broker. Ms. Jacobs stated the following:

> It typically takes two persons to enter [information in the MLS] and the broker has the control over the listing status of the listing. So when you see that the status was changed to extended and then it being temporarily withdrawn and

then it being changed to expired, it's the broker who has the overall say
ultimately in terms of whether or not the listing is active, whether it's
being extended, whether it's temporarily withdrawn, whether it's cancelled or
whether it's present or not.  And of note, it's important that Mr. Lupo in his
capacity as an individual, a trustee, and a married man advertised me as his
real estate salesperson through November 29, 2010.

During her testimony, Ms. Jacobs admitted she filed a complaint against the Debtor
with the Massachusetts Commission against Discrimination ("MCAD") on January 12, 2010,
based upon the Debtor's alleged sex discrimination and retaliation, and that she signed the
complaint under penalty of perjury.  Additionally, she admitted that in the complaint she
alleged that she was laid off on December 17, 2009.  Nevertheless, Ms. Jacobs maintained that
she was employed by the Debtor postpetition until such time as the Trustee was appointed.

The Debtor described the relationship with Ms. Jacobs quite differently.  He indicated
that he and Ms. Jacobs intended to form a partnership, reviving Lupo Associates Realtors,
and that Ms. Jacobs's partnership contribution was to be her listings from Weichert Realtors.
He expressed sympathy for Ms. Jacobs, who had attended medical school but did not practice
medicine because of professional misconduct charges brought against her by the New York
board of registration in medicine, as he also had discipline imposed against him  and is
suspended from the practice of law.  Accordingly, he testified that he continued to let Ms.
Jacobs work for him as a salesperson, although the terms of their partnership agreement were
never formalized either verbally or in writing.

Although the Debtor, testifying on behalf of the Trustee, stated that Ms. Jacobs was
not entitled to any commissions or compensation, he executed an Affidavit on December 7,

11

2009, which  provided the following:

> *Lisa Jacobs works for me* and I am the broker with the office in Waltham.  James
> Lowenstern has been holding Lisa Jacobs hostage as he has been refusing to
> pay her commissions due to her unless she signs away her right to sue for
> gender discrimination.  Lowenstern can not give her her commissions because
> she is a woman with a gender and retaliation claim against him.  I and James
> Lowenstern have had discussions and he released her listings to her new
> broker namely myself.  He must release commissions to her without requiring
> her to give up her right to sue him for gender discrimination.  To date, he has
> not paid her despite having a commission in his possession for many months.

> Weichert Realtors Castles Unlimited has been bad mouthing Lisa to our clients,
> interfering with our contractual relations with clients and should not have
> motivated and instructed our clients to be filing against her at the Board.

> It is presumptuous for James Lowenstern to claim that she diverted his
> company's funds to other brokers.  He has the duty and obligation of proving
> in arbitration that those funds are actually due to him.  I have been disputing
> what commissions are due to which broker and what amount.

(emphasis supplied).  Although the Debtor is an attorney, albeit one suspended from the

practice of law, he testified that he signed the affidavit without reading it.  He recognized in

his testimony, however, that Ms. Jacobs had been involved in a dispute with Mr. Lowenstern

and had filed a complaint against him with the Massachusetts Board of Registration of Real

Estate Brokers, as well as a complaint with the Massachusetts Commission against

Discrimination. He further testified that a real estate sales person must work 25 hours per

week under the supervision of a broker.  The Debtor indicated that Ms. Jacobs did not work

regular hours and that she would arrive at the office in the morning and then disappear until

the late afternoon.

With respect to the MLS, the Debtor testified that he had never actually used the MLS

system, relying upon his secretary to input data.  He stated: "you have to belong to the service, pay your dues, be a broker or Realtor. You -- I believe you enter an ID or pass code or something. That's -- and then you can imp -- it's a form and I guess you just fill in the information. I haven't done it."  The Debtor stated his belief that only brokers could place a listing with the MLS, but he theorized that Ms. Jacobs could have accessed the MLS "if she had a pass code or a user ID or something of the sort."

The Debtor further testified that he and his bankruptcy attorney, Andrew Lizotte, Esq. spoke with Ms. Jacobs after the commencement of the case.  He stated that she was advised not to contact him and that any communication should be through  his attorney.

Ms. Penelope Ann Bley, a forensic accountant with Verdolino & Lowey, P.C., testified that she examined the Debtor's books and records and uncovered no evidence whatsoever that Ms. Jacobs was an employee or independent contractor of the Debtor.  She stated that there were no records of Ms. Jacobs's receiving payments of any kind and no record of any invoices submitted by Ms. Jacobs to the Debtor.

Neither the Debtor, as debtor-in-possession, nor the Trustee filed an application to employ Ms. Jacobs as a professional person during the Chapter 11 case.

## III. POSITIONS OF THE PARTIES

A. <u>The Prepetition Claim</u>

The Trustee maintains that Ms.Jacobs was never employed by the Debtor and that the Debtor never agreed to pay her for any services that she might have performed. He emphasizes that the Debtor's books and records did not establish employment of, or payment

to, Ms. Jacobs, facts which she does not dispute.  Accordingly, he contends that Ms. Jacobs

is not entitled to an allowed prepetition claim against the Debtor's bankruptcy estate.

Alternatively, in the event that the Court were to determine that Ms. Jacobs holds a

prepetition claim against the Debtor's bankruptcy estate, the Trustee argues that Ms. Jacobs

overstated the amount of her claim.

In addition, the Trustee argues that the testimony and exhibits produced at the trial

were sufficient to deprive Ms. Jacobs's claims of any presumptive validity.  According to the

Trustee, Ms. Jacobs's claim for reimbursement at the hourly rate of $35 was contradicted by

the Debtor's testimony that he had no agreement to pay Ms. Jacobs an hourly wage.  The

Trustee also argues that Ms. Jacobs's testimony as to her entitlement to a $35 per hour wage

is based upon "a vivid imagination and not a legal obligation."  The Trustee notes that Ms.

Jacobs testified that  the Debtor paid another property manager $25 per hour, not $35 per

hour, even though she and the other employee "performed the same basic tasks."  According

to the Trustee, Ms. Jacobs produced no evidence of any agreement with the Debtor to pay her

hourly wages or to pay her an hourly wage at the rate of $35 per hour.

The Trustee intimates that Ms. Jacobs's claim is fraudulent because it defies common

sense that an employee would continue working without compensation.  He asserts that "[i]t

is even more unlikely that an individual whose employer has filed bankruptcy and who has

failed to pay her for '4 months and 1 week' would continue to work without being paid for

an indefinite period of time in the future."  The Trustee also argues that Ms.  Jacobs's attempt

to advance  false claims is evidenced by her contention that she is entitled to both hourly

14

wages and commissions income, a circumstance which in his view "defies credulity." The Trustee notes the absence of evidence as to when any earned commissions were to be paid and at what rate.

Ms. Jacobs did not specifically address her prepetition claim, focusing instead on her request for administrative expenses.[11]

B. The Claim for Administrative Expenses

The Trustee contends that Ms. Jacobs did not perform any "actual" or "necessary" services for the benefit of the estate, pointing to an absence of evidence that she completed any rental or sale transactions post-petition. In fact, he maintains that the evidence offered by Ms. Jacobs shows that the MLS rental and sale listings were terminated by December 18, 2009, seven days after the Debtor filed his Chapter 11 bankruptcy petition. Further, he emphasizes Ms. Jacobs's admission in her MCAD complaint that she was "laid off" by the Debtor on December 17, 2009, as well as the Debtor's testimony that, on or about December 12, 2009, his attorney advised Ms. Jacobs not to contact him any more. To the extent Ms. Jacobs actually performed any services after the petition date, the Trustee asserts that she understood (or should have understood) that she was not authorized by the Debtor or the bankruptcy estate to do so.

Ms. Jacobs argues that from December 10, 2009 through December 17, 2010, she worked as a salesperson and property manager for the real estate properties of Robert Lupo,

---

[11] *See* note 12, *supra.*

individually; Robert Lupo, as Trustee; and Robert Lupo and Jeanne Reynolds, for 43 hours

per week.  She seeks compensation for those hours at the rate of  $35 per hour for a total of

$79,765.000.[12]  She maintains that as a salesperson, she showed properties to prospective

buyers and did all things necessary to promote the sales of the real estate properties. As a

property manager, she contacted tenants regarding management issues such as collection of

rent, maintenance of the property and any other issues that arose.  She further maintains that

the Debtor never objected to her activities, encouraged her efforts and benefitted from them.

After the Debtor commenced his Chapter 11 case and before the appointment of the

Trustee, the Debtor, according to Ms. Jacobs, continued to use her services, which provided

an actual benefit to the estate that was necessary for preservation of the estate, i.e., the

Debtor's real estate business.

Ms. Jacobs also asserts that her claim includes damages for gender discrimination and

sexual harassment (still under investigation by the MCAD) and that the Debtor's failure

and/or refusal to compensate her was based on her gender and not because she did not

provide the services for which she seeks compensation.


## IV. APPLICABLE LAW

A. <u>Proofs of Claim</u>

Sections 501 and 502 of the Bankruptcy Code govern the filing and allowance of proofs

---

[12] Ms. Jacobs, in her proof of claim, claimed entitlement to compensation in the amount of $25,585 for working for the Debtor between August 12, 2009 and December 10, 2009.

of claim in bankruptcy proceedings. *See* <u>Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.</u>, 549 U.S. 443 (2007). When a debtor commences a bankruptcy case, creditors are entitled to file proofs of claim against the debtor's estate pursuant to § 501. Once a creditor has filed a proof of claim, the bankruptcy court must determine whether the claim is "allowed." *See* <u>Am. Express Bank, FSB v. eCast Settlement Corp. (In re Plourde)</u>, 418 B.R. 495, 502 (B.A.P. 1st Cir. 2009)(footnote omitted). Section 502(a) provides that a proof of claim filed under § 501 is deemed allowed unless a party in interest objects. <u>Id.</u> at 502-03. Even where a party in interest, such as the trustee, objects, the bankruptcy court must allow the claim unless one of nine exceptions enumerated in § 502(b) applies. <u>Id.</u> at 503 (footnote omitted). *See also* <u>Banco Popular de Puerto Rico v. Torres (In re Torres)</u>, No. 09-09187-ESL, 2011 WL 4592029 at *4 (1st Cir. Jan. 19, 2011).

According to the panel in <u>Plourde</u>, pursuant to 11 U.S.C. § 101(5),

"[a]llowance" constitutes determination of the amount of a "claim" . . . "in lawful currency of the United States as of the date of the filing of the petition" except to the extent that it is unenforceable as a matter of law (generally speaking, contract law) or unless its enforceability against the estate is limited for reasons related to bankruptcy policies such as equalizing treatment among creditors or avoiding overreaching by insiders of the debtor.

<u>In re Plourde</u>, 418 B.R. at 502 n.10 (citing 11 U.S.C. § 502(b)).

Bankruptcy Rule 3001(f) governs the evidentiary effect of a properly filed proof of claim. It provides that a claim "filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim," *see* Fed. R. Bankr.P. 3001(f), "requiring an objecting party to produce 'substantial evidence' to rebut this presumption of

validity." *See* <u>In re Torres</u>, 2011 WL 4592029 at *4 (citing <u>Juniper Dev. Group v. Kahn (In re</u>

<u>Hemingway Transp., Inc.)</u>, 993 F.2d 915, 925 (1st Cir.1993)). "If the objection is substantial,

the claimant then must produce evidence to support her claim and  bears the burden of

proving her claim by a preponderance of the evidence." <u>In re Torres</u>, 2011 WL 4592029 at *4

(quoting <u>In re Plourde</u>, 418 B.R. at 504 and <u>In re Organogenesis, Inc.</u>, 316 B.R. 574, 583 (Bankr.

D. Mass.2004))(internal quotations omitted).

      B. <u>Administrative Expenses</u>

      Ms. Jacobs, without mentioning 11 U.S.C. §§ 503(a), 503(b)(1)(A), or 507(a)(2), asserts

entitlement to reimbursement of her administrative expenses.[13]   Section 503(b) of the

Bankruptcy Code provides in relevant part the following:

> After notice and a hearing, there shall be allowed administrative expenses,
> other than claims allowed under section 502(f) of this title, including—
>
>       (1)(A) the actual, necessary costs and expenses of preserving the
>       estate. . . .

11 U.S.C. § 503(b).

      The court in <u>In re Diomed Inc.</u>, 394 B.R. 260 (Bankr. D. Mass. 2008), set forth the law

applicable to the allowance of administrative expenses.

> As the party asserting the administrative claim, [the claimaint] bears the
> burden of satisfying each element of § 503(a)(2)(B) by a preponderance of the
> evidence. <u>Woburn Assoc. v. Kahn (In re Hemingway Transport, Inc.)</u>, 954 F.2d
> 1, 5 (1st Cir. 1992). Citing to the pre-Bankruptcy Code case of <u>Cramer v.</u>

---

[13] Section 503(a) governs when a request for administrative payment may be made;
section 507grants a second priority, behind domestic support orders, to administrative
expenses allowed under section 503(b).

<u>Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)</u>, 536 F.2d 950 (1st Cir.1976),
the <u>Hemingway</u> court instructed that generally

> a request for priority payment of an administrative expense
> pursuant to Bankruptcy Code § 503(a) may qualify if (1) the
> right to payment arose from a postpetition transaction with the
> debtor estate, rather than from a prepetition transaction with the
> debtor, and (2) the consideration supporting the right to
> payment was beneficial to the estate of the debtor.

<u>Hemingway</u>, 954 F.2d at 5. *See also* <u>In re PYXSYS</u>, 288 B.R. 309 (Bankr. D. Mass.
2003). "The traditional presumption favoring ratable distribution among all
holders of unsecured claims counsels strict construction of the Bankruptcy
Code provisions governing requests for priority payment of administrative
expenses." <u>Hemingway</u>, 954 F.2d at 4–5. Nevertheless, as one of the primary
purposes of § 503(b)(1)(A) is to encourage parties to do business with a debtor
in possession or trustee, the "actual, necessary costs and expenses of
preserving the estate" include "the actual and necessary expenditures of the
trustee in operating the business of the estate." 4 L. King, COLLIER ON
BANKRUPTCY ¶ 503.06, at 503–24.2 (15th Ed. Rev.1995).

<u>In re Diomed, Inc.</u> 394 B.R. at 265-66 (footnote omitted).  The court noted an exception to the

general rules, however, stating the following:

> Based on the Supreme Court decision of <u>Reading Co. v. Brown</u>, 391 U.S. 471,
> 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), the First Circuit has also recognized a
> "special category" of administrative expense claim based on principles of
> fundamental fairness. <u>Hemingway</u>, 954 F.2d at 5; <u>Mammoth Mart</u>, 536 F.2d at
> 954. Traditionally, such administrative expense claims, however, have been
> applied to torts and speak only to the second prong of . . . what the <u>PYXSYS</u>
> court referred to as the <u>Mammoth Mart</u>/<u>Hemingway</u> analysis as the special
> category arises only when the claimants are "injured by the
> debtor-in-possession's operation of the business even though their claims did
> not arise from transactions that were necessary to preserve or rehabilitate the
> estate." <u>Hemingway</u>, 954 F.2d at 5(quoting <u>Mammoth Mart</u>, 536 F.2d at 954).
> *See also* <u>Spunt v.Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)</u>,
> 755 F.2d 200 (1st Cir.1985)(granting administrative status to award of damages
> for postpetition breach of injunction aimed at preventing a nuisance);
> <u>Carter–Wallace, Inc. v. Davis–Edwards Pharmacal Corp.</u>, 443 F.2d 867, 874 (2d
> Cir.1971)(terminating a temporary injunction against debtor's use of patent and

noting patentee would have administrative claim if debtor's postpetition use
subsequently determined to be an infringement). . . .

Diomed Inc., 394 B.R. at 266 n.10.

## V. DISCUSSION

At the outset, the Court observes that there are inconsistencies in the testimony of Ms.

Jacobs and the Debtor, and the terms of Ms. Jacobs's employment by the Debtor is vague.

The Court discounts, however, any inference that can be drawn from the absence of records

identifying Ms. Jacobs as either an independent contractor or employee.

Based upon the weight of the credible evidence, the Court finds that the Trustee

succeeded in overcoming the prima facie validity of Ms. Jacobs's proof of claim.  While the

Debtor's testimony was not compelling in all respects, when coupled with the inconsistencies

and errors in Ms. Jacobs's proof of claim, the burden shifted to Ms. Jacobs to establish her

entitlement to commissions and/or wages as a salesperson and property manager.  The Court

finds that Ms. Jacobs adduced some evidence to support her claim based upon the affidavit

of Attorney Greer and quantum meruit.

Although the parties did not reduce their agreement to a writing and did not agree on

material terms, the Court finds that the Debtor in fact employed Ms. Jacobs as both a property

manager and salesperson.  To the extent that there is no evidence as to the rate at which she

should be compensated, this Court has sufficient evidence to fashion relief based upon

quantum meruit.  "In determining a quantum meruit recovery, the proper focus is 'the value

of the services rendered .  .  . or [ ] the fair value of what the defendant has received.'"

20

Peabody N.E., Inc. v. Town of Marshfield, 426 Mass. 436, 443 (Mass. 1998)(citing Ryan v.

Ryan, 419 Mass. 86, 94 n. 12, 642 N.E.2d 1028 (1994); J.A. Sullivan Corp. v. Commonwealth,

397 Mass. 789, 797, 494 N.E.2d 374 (Mass. 1986); and 12 S. Williston, Contracts § 1477, at 261

n.18 (3d ed.1970)).

The Court, weighing the testimony of Ms. Jacobs and the Debtor, finds that they

contemplated a business arrangement whereby Ms. Jacobs would transfer her Weichert

Realty listings to Lupo & Associates and serve as a salesperson, primarily engaged in the

rental of the residential properties identified by the Examiner in his report, including single-

family houses, residential condominiums, and multi-family houses.  Because the properties

were primarily rented to Section 8 tenants, the Court also concludes that the Debtor

authorized or encouraged Ms. Jacobs to assume responsibility  for those properties as a

property manager in addition to securing tenants for them.  The Debtor knew or should have

known that Ms. Jacobs was acting as his agent.  Ms. Jacobs certainly thought she was acting

on his behalf.  If the Debtor did not intend for her to act on his behalf, it was incumbent upon

him to expressly and unequivocally terminate the relationship.

From the evidence presented and the Debtor's Schedule G, the Court finds that Ms.

Jacobs established entitlement to rental commissions for the following properties:  (1) 25

Melville Ave., Unit 1 (commission claimed $2,070); (2) 12A Nathan Road (commission

claimed of $1,761);[14] (3) 12B Nathan Rd. (commission claimed of $1,434) (4) 45B South St.

---

[14] Although Ms. Jacobs listed 12A Nathan Rd. twice, she and the Debtor both listed
William Fenzel as a tenant, the Debtor on Schedule G and Ms. Jacobs in her proof of claim.

(commission claimed of $990); (5) 45A South St. (commission claimed of $1,800); and (6) 62A

Orange St. (commission claimed of $1,476).  The commissions claimed with respect to those

properties total $9,531, which the Court shall discount by 15% because of Ms. Jacobs's failure

to submit evidence as to the customary commission rate for residential rental property and

because of the errors and inconsistencies in her proof of claim.  Accordingly, the Court shall

allow Ms. Jacobs's claim for commissions in the amount of $8,101.35 with respect to the

properties listed on her proof of claim for which she procured tenants, plus $1,906.12

($2,242.50 discounted by 15%) for the lease renewal commission for Marilyn Tulles at 32A

Dartmouth St. which lease is listed on the Debtor's Schedule G, for a total claim of $10,007.47

attributable to commissions.

     With respect to Ms. Jacobs's claim for wages as a property manager and office

manager, Ms. Jacobs's entitlement to compensation must be discounted because of her role

in the operation of The Piano Man, a non-debtor entity.  The Court concludes that Ms. Jacobs

is entitled to wages of $25 per hour for a work week of 25 hours for 17 weeks.  The Court

accepts the Debtor's testimony that Ms. Jacobs was not a constant presence at the real estate

office; Ms. Jacobs failed to rebut that evidence by submitting time records.  Accordingly, the

Court concludes that Ms. Jacobs is entitled to prepetition wages of $10,625.  Moreover, based

upon the unchallenged affidavit of Mike Robert, the Court finds that Ms. Jacobs is entitled

to $3,069 for keys and miscellaneous expenses incurred as property manager and salesperson.

---

Additionally, the MLS listing sheet shows the property was rented on November 21, 2009.

Thus, the Court finds that Ms. Jacobs has an allowed prepetition unsecured claim in the total amount of $23,701.47.

With respect to Ms. Jacobs's request for the payment of administrative expenses, the Court finds that the overwhelming weight of the evidence compels the conclusion that Ms. Jacobs is not entitled to any compensation for postpetition services as an employee or salesperson. The evidence submitted by Ms. Jacobs was wholly insufficient for this Court to conclude she is entitled to payment of her claimed administrative expenses. In the first place, it defies common sense for the Debtor to have engaged her after she had filed a complaint against him with the Massachusetts Commission against Discrimination. In addition, the Court believes the Debtor's testimony that his counsel advised Ms. Jacobs that her communications with the Debtor should be through counsel. Furthermore, the MLS listing sheets reflect that the properties, except those noted above, were withdrawn from the MLS by December 18, 2009.

Ms. Jacobs is not entitled to any commissions as a real estate salesperson because neither the Debtor nor the Trustee employed her as a professional. *See* 11 U.S.C. § 327. Moreover, any damages suffered by Ms. Jacobs as a result of gender discrimination are both suspect and speculative, particularly where Ms. Jacobs commenced an action against James Lowenstern for gender discrimination prior to obtaining employment with the Debtor. In sum, the Court finds that Ms. Jacobs failed to satisfy her burden of proof that any services she performed postpetition were actual and necessary expenses of preserving the estate or conferred a benefit on the bankruptcy estate. *See* In re Diomed Inc., 394 B.R. at 265-66.

## VI. CONCLUSION

In view of the foregoing, the Court shall enter an order allowing Ms. Jacobs's prepetition unsecured claim in the sum of $23,701.47 and denying her request for payment of any sums as administrative expenses of the Chapter 11 bankruptcy estate.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  July 23, 2012